Matthew J. Preusch (Bar No. 134610)
**KELLER ROHRBACK L.L.P.**
801 Garden Street, Suite 301
Santa Barbara, CA 93101
(805) 456-1496; Fax: (805) 456-1497
mpreusch@kellerrohrback.com

Derek W. Loeser, *pro hac vice forthcoming*
Gretchen Freeman Cappio, *pro hac vice forthcoming*
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
(206) 623-1900; Fax: (206) 623-3384
dloeser@kellerrohrback.com
gcappio@kellerrohrback.com

***Attorneys for Plaintiff***

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| SUSAN TRIPP, individually and on behalf of all others similarly situated,<br><br>                              Plaintiff,<br><br>       v.<br><br>WELLS FARGO & COMPANY, WELLS FARGO BANK, N.A., and WELLS FARGO HOME MORTGAGE,<br><br>                              Defendants. | Case No.<br><br>CLASS ACTION ALLEGATION COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

     Plaintiff Susan Tripp brings this lawsuit on behalf of herself and a proposed nationwide

class of similarly situated people who financed their homes through Wells Fargo & Company,

Wells Fargo Bank, N.A., and Wells Fargo Home Mortgage, collectively referred to in this

Complaint as Wells Fargo, the Bank, or Defendants. Plaintiff, though her Counsel, alleges the

following based on publicly available information, investigation of Counsel, and information and belief.

## I.  INTRODUCTION

1.      Like many Americans, Marion County resident Susan Tripp chose Wells Fargo to refinance the mortgage on her home in 2016. When Ms. Tripp began the financing process, Wells Fargo agreed to "lock" the offered mortgage interest rate for her potential loan.

2.      These "rate locks" help protect borrowers like Ms. Tripp from fluctuating interest rates during the closing process. That process is supposed to finish before the expiration of the rate-lock period. However, when Ms. Tripp's closing was delayed—through no fault of her own—Wells Fargo wrongly charged her a fee to extend her mortgage interest rate lock. She was forced to pay the fee or risk losing her loan and starting the financing process over again.

3.      What happened to Ms. Tripp is part of Wells Fargo's systematic, unlawful effort to charge borrowers fees to extend their mortgage interest rate-lock periods when the Bank, not the borrower, caused the need for that extension. One whistleblower has described the damage done to consumers as "much more egregious" than that caused by Wells Fargo's contemporaneous "fake account" scandal.

4.      As the Consumer Financial Protection Bureau ("CFPB") explained in an April 20, 2018 Consent Order[1] levying a $1 billion penalty against Wells Fargo, the Bank "unfairly failed to follow the mortgage-interest-rate-lock process it explained to some prospective borrowers[,]" borrowers like Ms. Tripp.

5.      The CFPB defined those borrowers as "Rate Lock Affected Consumers": "any prospective borrower who, during the Rate-Lock Relevant Period, was charged a fee for

---

[1] The CFPB's Consent Order is attached as Exhibit C to this complaint.

extending an interest-rate-lock period for a residential-mortgage loan when the fee should have been absorbed by [Wells Fargo] under its established policy."

6.      Those consumers fell victim to what the CFPB referred to as Wells Fargo's "Rate-Lock Specified Acts and Practices": "charging prospective borrowers a fee for extending an interest-rate-lock period when the fee should have been absorbed by [Wells Fargo] under its established policy and in a manner inconsistent with how it explained the rate-lock process to prospective borrowers."

7.      Unbeknownst to the public and Ms. Tripp, Wells Fargo had two Rate Lock Extension Fee practices: a written policy under which the Bank would pay for Bank-caused delays, and the de facto "borrower pays" policy under which the borrower always paid the fee.

8.      After examining the Bank's practices with the benefit of regulatory discovery, the CFPB—in concert with the Office of Comptroller of Currency ("OCC")[2]—concluded that Wells Fargo's de facto rate lock scheme violated a number of federal laws and "caused and was likely to cause substantial injury to consumers." The agencies levied a record-setting $1 billion fine against Wells Fargo.

9.      Those agency orders followed an October 2017 concession by Wells Fargo that its "rate lock extension policy implemented in September 2013 was, at times, not consistently applied, resulting in some borrowers being charged fees in cases where the company was primarily responsible for the delays that made the extensions necessary." Exhibit A (press release). While Wells Fargo's announcement states that as many as 110,000 borrowers may have been charged an improper Rate Lock Extension Fee, discovery will reveal the true scope of those affected.

---

[2] The OCC Consent Order is attached as Exhibit D. The CFPB and OCC orders also relate to Wells Fargo's auto loan insurance policies, which are the subject of separate consumer litigation.

10.    Available information already provides some indication of that scope. According to a whistleblower letter from a former Wells Fargo employee to lawmakers, the practice has resulted in Wells Fargo charging customers in the Los Angeles area alone millions of dollars in unwarranted mortgage interest Rate Lock Extension Fees. As one former Wells Fargo branch officer explained to *ProPublica*, the practice is "just stealing from people."

11.    To right this wrong, ensure Wells Fargo repays all unlawfully charged fees, obtain available statutory and other damages, and hold Wells Fargo accountable for yet another abuse of customer trust, Ms. Tripp brings this class action Complaint on behalf of herself and all similarly situated Wells Fargo borrowers nationwide.

## II.    JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 based on the federal statutory claims below, and the Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

13.    This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from one Defendant, there are 100 or more Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000.

14.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because the Court has personal jurisdiction over Defendants, a substantial portion of the alleged wrongdoing occurred in this District and Oregon, and Defendants have sufficient contacts with this District and Oregon.

15.    Venue is proper in the District of Oregon pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims at issue in this Complaint arose in this District.

16.    The Eugene Division is the appropriate Division for this action pursuant to Civil LR 3-2 because a substantial part of the events or omissions giving rise to the claim occurred in Marion County, a substantial part of the property that is the subject of the action is situated in Marion County, or both.

### III.    PARTIES

17.    Plaintiff Susan Tripp is a resident and citizen of Marion County, Oregon.

18.    Defendant Wells Fargo & Company is incorporated in Delaware with its principal place of business in San Francisco, California. Wells Fargo & Company is a financial services company with $1.9 trillion in assets and approximately 271,000 employees. It provides banking, insurance, investments, mortgage, and consumer and commercial finance through more than 8,500 locations, 13,000 ATMs, the internet and mobile banking, and has offices in 42 countries and territories. Wells Fargo & Company represents, through various means including in press releases issued from San Francisco, that it provides mortgage services:

> **About Wells Fargo**
>
> Wells Fargo & Company (NYSE: WFC) is a diversified, community-based financial services company with $1.9 trillion in assets. Wells Fargo's vision is to satisfy our customers' financial needs and help them succeed financially. Founded in 1852 and headquartered in San Francisco, Wells Fargo provides banking, insurance, investments, mortgage, and consumer and commercial finance through more than 8,400 locations, 13,000 ATMs, the internet (wellsfargo.com) and mobile banking, and has offices in 42 countries and territories to support customers who conduct business in the global economy. With approximately 268,000 team members, Wells Fargo serves one in three households in the United States. Wells Fargo & Company was ranked No. 25 on Fortune's 2017 rankings of America's largest corporations.

19.    Defendant Wells Fargo Bank, N.A. is a national banking association chartered under the laws of the United States with its primary place of business in Sioux Falls, South Dakota. Wells Fargo Bank, N.A. provides Wells Fargo & Company personal and commercial

banking services, engages in mortgage lending, and is Wells Fargo & Company's principal subsidiary. Well Fargo Bank, N.A. is also the successor by merger to Wells Fargo Home Mortgage, Inc.

20.     Defendant Wells Fargo Home Mortgage is a division of Wells Fargo Bank, N.A. and has its primary place of business in Des Moines, Iowa.

## IV.    FACTUAL ALLEGATIONS

21.     Wells Fargo is the nation's largest residential mortgage provider. The Bank's billions of dollars in mortgage origination profits appear to derive in part from its systematic effort to wrongly charge borrowers like Ms. Tripp fees to borrow money at their promised mortgage interest rate, and to mislead borrowers about that scheme.

**A.  Wells Fargo's Mortgage Rate Lock Extension Fees**

22.     When a customer approaches Wells Fargo to get a home mortgage or refinance, the Bank typically commits to fund the customer's loan at a stated interest rate *if* the home purchase and loan close within a given period, usually 30 to 90 days. That commitment is the interest "rate lock," and the 30 or 90 days is the "rate-lock period."

23.     The rate lock freezes the customer's offered interest rate during the rate-lock period, so a borrower does not need to worry that rates will rise while they complete the loan closing process. Typically, most loans close during the rate-lock period. Alternatively, for a fee, Wells Fargo may offer an extended rate-lock period to account for a longer period, like 90 days, which would be cheaper than later paying for a rate-lock period extension.

24.     However, if missing paperwork or other delays prevent the closing of a loan in the rate-lock period, the period can be extended—at a cost to Wells Fargo's customers. If the delay is the borrower's fault, the borrower pays a fee, the amount of which is based on the size of the

loan. If the delay is caused by the Bank's actions, the Bank is supposed to absorb the cost of extending the rate-lock period.

25.     As the CFPB found, "it was [Wells Fargo]'s policy that when a mortgage loan did not close within its initial interest-rate-lock period and the primary cause of the delay was attributable to [Wells Fargo], if the borrower chose to extend the interest-rate-lock period, the extension fee was to be charged to [Wells Fargo], and not the borrower."

26.     However, contrary to that written policy, Wells Fargo had a de facto policy: Regardless of who causes a delay, the borrower pays the extension fee. This is the "borrower pays" model.

27.     Those "Rate Lock Extension Fees" can be significant. The fees are reportedly set at between .125 percent and .25 percent of the loan amount, depending on the type of loan. So, for example, for a loan of $500,000, the Bank would charge a Rate Lock Extension Fee of $1,250.

28.     In May 2012, according to the CFPB, Wells Fargo stopped charging Rate Lock Extension Fees to borrowers in response to internal processing delays, and instead extended rate-lock periods without charging borrowers a fee. This aligned Wells Fargo's practices with many of its competitors, which also covered the rate-lock fee as a matter of course.

29.     However, in September 2013 Wells Fargo enacted a policy providing that "if a rate-lock extension was made necessary by borrower-caused delays, or by certain delays related to the property itself, the borrower could be charged an Extension Fee; if there were lender-caused delays, however, Respondent would extend the rate-lock period without charging borrowers a fee, as it had done since May 2012."

30.    "Within days of rolling out the new policy," CFPB found, "[Wells Fargo] acknowledged in internal communications that its guidelines for its loan officers were inadequate. Respondent instructed employees that Extension Fees would be charged based on the factor primarily responsible for the delay, without further guidance as to what that meant."

31.    In practice, however, it often meant that Wells Fargo charged borrowers to extend the rate lock when borrowers were *not* the factor primarily responsible for the processing delay. As the CFPB found, "in certain instances, [Wells Fargo] inappropriately charged borrowers rate-lock-extension fees that should have been absorbed by" Wells Fargo.

32.    This was contrary to its pre-2012 policy of covering the cost where borrowers were not to blame (the so-called "Lender Paid Model"), and a complete departure from its policy of extending rate-lock periods with no fee at all. Moreover, for many customers, Wells Fargo's new practice functioned as a bait-and-switch, springing surprise fees on borrowers who were promised a "no cost refinance."

33.    According to reports—including those made by whistleblowers—the Bank caused the large majority of closing delays. For example, Wells Fargo may not timely secure an appraisal due to a shortage of appraisers, the Bank may be staffed by underqualified underwriters, or the Bank may lack adequate staff (or adequately trained staff) to handle the volume of loan applications. Often, Wells Fargo's underwriting department would experience multi-week backups, meaning it was foreseeable that Wells Fargo would be unable to close on a loan within the initially established rate-lock period.

34.    Despite those Bank-caused delays, Wells Fargo managers pressured employees to blame customers for the delays so that the Bank could charge Rate Lock Extension Fees. To shift the blame to customers, employees manufactured excuses for the delays, like needing an updated

bank statement, or missing signatures, paperwork, or pages in material the borrowers already submitted.

35.    Wells Fargo even made it difficult for employees to not assign borrowers the fee. For example, while Bank-paid Rate Lock Extension Fees appear to have required the approval of a regional manager, determinations of borrower-caused delays did not. Wells Fargo further dis-incentivized loan officers from submitting requests for Bank-paid extension fees by instituting a complex, paperwork-heavy process that took several hours to complete and often ended in a denial for lack of compliance. Moreover, if mortgage consultants accumulated too many borrower-charged extension fees in their files, they were reportedly subject to reprimand. Regional managers tracked the progress of the loans through Wells Fargo's Pipeline Optimization Portal, or "POP," which contains information on the status of loans and any delays in processing.

36.    Predictably, perpetrating this scheme caused extreme stress to Wells Fargo employees, whose job it was to explain to frustrated customers why they were being charged a fee through no fault of their own. Employee stress caused by pressure to perform unscrupulous practices was also a hallmark of Wells Fargo's sham account scandal, and more generally is an indicator of corporate malfeasance.

37.    The "borrower pays" model was apparently promoted at a March 2013 Divisional meeting overseen by former Pacific Divisional Manager Drew Collins at a Marriott Hotel in downtown San Diego, based on Counsel's investigation. At that meeting, former Regional Manager Sandy Streator reportedly explained to those present how Wells Fargo could charge faultless borrowers Rate Lock Extension Fees, and that it could do so because Wells Fargo's rate lock documents—in particular, its "GLAD" forms—supposedly permitted it.

38.     Many current and former Bank employees have since spoken out. A person

identifying himself as Jeffrey Clark, a former Wells Fargo manager in Los Angeles, commented

on a *ProPublica* story that employees "were forced to push the rate lock extension to borrowers,

when all along it was the processing delays in Underwriting" that caused the rate lock to expire.

"I would say 99% of the time our requests denied by my Area/Regional management and were

labeled as a borrower delay and therefore a charge for the extension was charge[d] to the

borrower." If the borrower did not agree to pay the fee, "we just cancelled the loan."



39.     In a detailed letter to lawmakers attached to this Complaint as Exhibit B and

incorporated by reference, former Wells Fargo employee Frank Chavez described the practice of

passing on "the cost of Interest Rate Lock Extensions . . . which Wells Fargo should have paid

out of its own pocket":

**RE:  IMPROPER/FRAUDULENT CHARGING of INTEREST RATE LOCK EXTENSION FEES to BORROWERS by WELLS FARGO HOME MORTGAGE**

**Dear Representatives and Senators,**

This is to inform members of Congress and others regarding a systematic effort on the part of area and regional management of Wells Fargo Home Mortgage in at least the Greater Los Angeles area to pass on the cost of Interest Rate Lock Extensions on pending conventional and jumbo mortgage loan applications which Wells Fargo should have paid out of its own pocket rather than the bank's borrowers/customers over a period of approximately two years.

40.    In his letter to lawmakers, Mr. Chavez wrote that even though the practice is

"more complicated and less intuitive than the Fraudulent Account Opening Scandal of earlier

this year, I believe the damage done to Wells Fargo mortgage customers in this case is much,

much more egregious." That damage, Mr. Chavez wrote, stemmed from a "systematic effort to

wrongly offload" the costs of interest rate lock extensions onto borrowers.

41.    Mr. Chavez's letter described some of the "most blatant" methods of assigning

blame—and costs—to borrowers:

      A.    In a practice known as an AIRL, Wells Fargo had the underwriter stop the

            Equal Credit Opportunity Act Regulation B "clock" and note the file as

            missing customer documentation or information, even though it had

            already been provided and was available for review.

      B.    Noting delays caused by the banker or home mortgage consultant as

            "customer-caused" or "customer-related" delays.

42.    Mr. Chavez explained that Wells Fargo's own records would provide a paper trail

of the alleged scheme:

COMPLAINT
11

These three methods of systematically and wrongly shifting the blame for delays onto the customer can be evidenced by internal emails between: frontline HMC's or PMB mortgage bankers; the Los Angeles PMB Area Manager, Ken Vils; Regional WFHM Manager, Tom Swanson; Regional Processing Manager, Heidi Schlagel; and various branch managers throughout the Los Angeles area. PMB Bankers were instructed to send specifically structured/worded emails to one or more of the above managers (depending on the situation) requesting approval for needed Interest Rate Lock Extensions.

43.     More recently another former Los Angeles Wells Fargo employee, Mauricio Alaniz, alleged in an employee whistleblower lawsuit against Wells Fargo that Wells Fargo falsified records to "state that [a processor] had contacted customers and requested documentation when in fact she had not done so." When the rate-lock period for those customers expired, Wells Fargo allegedly told Mr. Alaniz that the customers would be charged for the rate lock extension, even though he "had already reported that the delays were not the customers' fault and that [Wells Fargo's] loan processor had falsified records to appear otherwise."

44.     Yet another former Los Angeles area Wells Fargo employee, Dave Eghbali, has filed an employment lawsuit against the Bank, alleging that it wrongfully terminated him for trying to protect his mortgage customers from the harmful practices discussed herein. According to Eghbali, the rate-lock scheme was "immensely profitable for Wells Fargo," in part due to the high-dollar mortgages he refinanced for his Beverly Hills customers. A single rate-lock extension could yield thousands of dollars in additional profit for Wells Fargo—even if its own lack of diligence necessitated the delay, thus inconveniencing the borrower now stuck with the unexpected and unfair bill.

45.     While Mr. Chavez's letter and Mr. Alaniz's and Mr. Eghbali's allegations reveal the practices in the Los Angeles area—practices Mr. Chavez described as Wells Fargo's

"concerted effort to wrongly pass the cost on to the consumer/borrower for costs the bank should have paid"—those practices do not appear to have been limited to Los Angeles or California.

**B. Wells Fargo's Widespread Practice of Wrongly Charging Fees to Borrowers**

46.     Investigation by Plaintiff's Counsel and publicly available information confirm the CFPB's and OCC's findings that the practice was or is widespread.

47.     Two former loan officers and one former Wells Fargo branch manager from Oregon told *ProPublica* that "they were instructed to charge customers for mortgage lock extensions even when the bank was responsible."

48.     A self-identified former Wells Fargo employee posted online that "[t]his was not just in LA it was in [New Jersey] as well. Time after time borrowers were charged the extension fee when it was not their fault but the bank's due to understaffed processing and underwriting!"

49.     The practice has also been the subject of consumer complaints from around the nation to federal agencies. For example, in 2013, a borrower in Iowa filed a complaint with the OCC explaining that after Bank-caused delays, her or she was "informed I need to pay close to $500 more at closing time to extend my rate. . . I don't feel I should be penalized by additional closing costs when I did not cause any delay."

50.     Another complaint filed with the OCC states, "I would like Wells Fargo's use of rate-lock extension fees to be investigated as I believe I can[]not be the only consumer this has happened to."

51.     A 2016 complaint to the Federal Deposit Insurance Corporation from 2016 tells a similar story: after numerous delays, Wells Fargo informed a borrower that if he or she wanted to continue the financing "process they 'require[d]' a fee of $250.00 for a rate lock because of all

the delays. I feel that they have delayed our loan in order to make us pay additional money and this is unjust."

      52.    Other customers have posted similar complaints online:

        A.    "[T]he Wells Fargo loan consultant force me to pay my extension fee which was a substantial amount of money (over $3,000!). The delays were caused by the bank and I didn't want to lose the low rate I had locked."

        B.    "The loan officer at Wells Fargo forced us to pay a rate lock extension on our condo refinance, when the delay was the bank's fault. . . . Unfortunately, we had no choice since we were changing our loan program and we were more than 60 days in the process with a good rate at the time."

        C.    "Yes, this happened to me as well with Wells…They had all my paperwork for about 3 months and delayed it intentionally."

        D.    "We ended up paying a rate lock extension of $4,500 purely because our rate was great and the cost of not getting that rate was far worse."

        E.    "My rate lock expired on August 13 and [I] was told that I had to extend the rate. . . . All sorts of excuses are given. . . . This is a nightmare that I am going through with them."

      53.    In short, Ms. Tripp's experience—described in more detail below—appears to be part of a widespread, systematic effort to foist unwarranted fees onto Wells Fargo borrowers that began as early as 2012, as the Bank began to experience increasing delays in closing home loans.

54.    Wells Fargo was or should have been aware of this widespread practice since at least 2013 when it was discussed at the Divisional Meeting in San Diego, and an internal audit identified the risk to consumers relating to improperly-assessed Rate Lock Extension Fees. Beyond that, Wells Fargo also knew or should have known because of 2015 correspondence to Mike Heid, former President of Wells Fargo Home Mortgage, and other senior Wells Fargo executives from a dissatisfied borrower describing his experience with a Rate Lock Extension Fee. That correspondence is attached to Mr. Chavez's whistleblower letter.

55.    According to the CFPB, "[a]lmost three years after a 2013 internal audit first identified the risks for consumer harm relating to improperly assessed Extension Fees, an October 2016 internal audit found that Respondent inconsistently applied its policy and charged borrowers Extension Fees in situations where Respondent was responsible for the delay in the loan's closing."

56.    Though Wells Fargo knew or should have known about these practices, it failed to act to stop them. Wells Fargo acted willfully, with reckless disregard for the rights and interests of Ms. Tripp and the Class, with gross negligence, or with both, such as to warrant an award of punitive damages.

**C.  Wells Fargo Pays a Record Penalty For its Rate Lock Fee Practices**

57.    Since Mr. Chavez sent his letter, Wells Fargo's Rate Lock Extension Fee practices became the subject of a federal investigation by the CFPB. The CFPB reviewed Wells Fargo's conduct relating to "charging fees for rate-lock extensions in connection with residential-mortgage lending" and found the "following violations of law": Wells Fargo "unfairly failed to follow the mortgage-interest-rate-lock process it explained to some prospective borrowers[.]" As a consequence, the CFPB issued a $1 billion civil penalty.

58.    The CFPB Order specifically defines a "class" of affected consumers. "Rate-Lock Affected Consumers" are "any prospective borrower who, during the Rate-Lock Relevant Period, was charged a fee for extending an interest-rate-lock period for a residential-mortgage loan when the fee should have been absorbed by [Wells Fargo] under its established policy." The defined period on the CFPB Order is September 16, 2013, through February 28, 2017.

59.    The CFPB Order does not expressly set aside any funds for consumers; however, it directs Wells Fargo to create a Rate-Lock Remediation Plan and to submit that plan to the CFPB's Regional Director in San Francisco. That Remediation Plan may not condition "the payment of any redress to any consumer on that consumer's waiving any right, except that the Remediation Program may include procedures and standards for waivers in litigated settlements, settlements involving parties represented by counsel, settlements with any other governmental regulatory or enforcement agency, or in other circumstances acceptable to the Regional Director" in San Francisco.

60.    The CFPB order provides that, to "the deterrent effect of the civil money penalty in any Related Consumer Action, Respondent may not argue that Respondent is entitled to, nor may Respondent benefit from, any offset or reduction of any compensatory monetary remedies imposed in the Related Consumer Action because of the civil money penalty paid in this action or because of any payment that the Bureau makes from the Civil Penalty Fund (Penalty Offset)." A "Related Consumer Action" is an action like this one: "a private action by or on behalf of one or more consumers or an enforcement action by another governmental agency brought against Respondent based on substantially the same facts[.]"

61.    At the same time the CFPB issued its consent order, the OCC issued two orders of its own. Those orders describe how the OCC "identified deficiencies in the Bank's enterprise-

wide compliance risk management program that constituted reckless unsafe or unsound practices and resulted in violations of the unfair acts or practices provision of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1)."

62.    The OCC identified that, beginning "in at least September 2013 and continuing through March 2017," it was the Bank's policy to charge itself extension fees "where the Bank was responsible for the failure of the loan to close. . . . However, in a number of instances, the Bank charged customers mortgage interest rate lock extension fees even though the Bank had caused the loan closing to fail to occur within the mortgage interest rate lock period." "As a result of the Bank's mortgage interest rate lock extension fee practices, customers were improperly charged mortgage interest rate extension fees when the Bank should have borne those costs."

63.    The OCC Penalty Order finds that the Bank's rate-lock fee practices violated the "unfair acts or practices provision of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), and were unsafe or unsound." "By reason of the foregoing conduct, the Bank engaged in reckless unsafe or unsound practices and violations of law that were part of a pattern of misconduct, and was unjustly enriched."

64.    While the OCC Consent Order does not set aside a specific amount for consumer remediation, it says the Examiner-in-Charge "may require" submission of a plan where the number of customers likely to receive remediation exceeds 50,000; the anticipated total amount of remediation exceeds $10 million; or the "customer harm being remediated poses or has resulted in significant reputational risk to the Bank, or creates other supervisory concern."

65.    Numerous commentators have criticized the federal agency orders for not ensuring remediation to consumers like Ms. Tripp. As noted in *American Banker*, "not a penny

of [the $1 billion fine] will go to Wells customers harmed by the practices at issue."[3] As one former CFPB senior enforcement counsel said, "Wells Fargo can give money back to customers as they choose and CFPB can object after the fact. And my suspicion is, there won't be objections."[4]

**D.  Plaintiff Tripp's Experience**

66.    Ms. Tripp, a Marion County Circuit Court Judge, was one victim of Wells Fargo's de facto "borrower pays" policy.

67.    Ms. Tripp and her partner refinanced their Marion County home in October 2016. At the start of the refinancing process, a Wells Fargo employee told her she should lock her rate, and that the Bank did not see any reason why the loan should not close during the rate-lock period.

68.    Later in the refinancing process, however, when Mr. Tripp asked what would happen if the process was not complete during the lock-in period, Bradley Mudd, a mortgage consultant for Wells Fargo Home Mortgage in Salem, told her it would cover the cost of extending her lock. But a Wells Fargo manager later reversed that decision, Mr. Mudd told her, so she would need to pay a fee to extend her rate-lock period because of delays in the closing department and the appraisal ordered by Wells Fargo.

69.    Mr. Mudd told Ms. Tripp at the time that Wells Fargo had difficulty ordering an appraisal because the "appraiser pool in Oregon is the worst in the country due to our over stringent requirements to become an appraiser . . . . This has become a huge problem in Salem and surrounding areas."

---

[3] American Banker, *How Huge Wells Fine Could Leave Customers in the Cold* (Mar. 1, 2018)

[4] Consumer Reports, *Where the $1 Billion From the Wells Fargo Settlement Goes: Regulators split the money, while consumers have to wait for a compensation plan,* (Apr. 20, 2018), https://www.consumerreports.org/wells-fargo/where-one-billion-from-wells-fargo-settlement-goes/

70.     Mr. Mudd also said that once Wells Fargo received the appraisal, the paperwork took "longer than usual but not by a lot" in Wells Fargo's closing department. He told Ms. Tripp her Rate Lock Extension Fee was $567.50 to extend her rate lock for 15 days.

71.     Her rate lock agreement locked her rate at 3 percent, but at the time the lock expired, rates were still 3 percent. Ms. Tripp therefore asked if instead of extending her rate lock, she could close at current interest rates. Wells Fargo replied that she could not, and they would pull her loan and she would have to start the refinancing process over again if she did not pay the extension fee.

72.     Ms. Tripp's closing documents reflect the $567.50 Rate Lock Extension Fee she was forced to pay to Wells Fargo Bank, N.A.:

| Rate Lock Extension | Wells Fargo Bank, N.A.ISAOA | 567.50 |
| Appraisal | | |

73.     What happened to Ms. Tripp was part of an established pattern. According to *ProPublica*, "In Oregon two former loan officers and one former branch officer said they were instructed to charge customers for mortgage lock extensions even when the bank was responsible."

74.     While Wells Fargo attempted to blame the slow appraisal process on borrowers, "the former employees said Wells Fargo made it hard for customers to obtain timely appraisals. Few appraisers wanted to work with the bank because it didn't pay as well as other mortgage lenders and was slower than competitors," *ProPublica* reported.

75.     Because Wells Fargo forced her to pay a Rate Lock Extension Fee, Ms. Tripp has suffered concrete, particularized injury caused by Wells Fargo's actions, which this lawsuit can redress.

## V.    CLASS ACTION ALLEGATIONS

76.    This matter is brought by Ms. Tripp on behalf of herself and those similarly situated, under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3). The Class that Ms. Tripp seeks to represent is defined at this time as follows:

> All persons who obtained a Wells Fargo mortgage, including a refinance, from September 1, 2013 to February 28, 2017, and were charged a fee for extending an interest-rate-lock period for a residential-mortgage loan in violation of Wells Fargo's established interest-rate-lock extension policy.[5]

77.    Excluded from the Class are Wells Fargo's officers, directors, and employees; the judicial officers and associated court staff assigned to this case; and the immediate family members of such officers and staff. Ms. Tripp reserves the right to amend the class definition based on information obtained in discovery.

78.    **Numerosity**: The members of the Class are so numerous that joinder of all members would be impractical. The proposed Class likely contains tens of thousands of members, by Wells Fargo's own admission. *See* Exhibit A. Wells Fargo is the nation's largest home lender, controlling a roughly 12 percent market share in 2016. The precise numbers of members can be ascertained through discovery, which will include Defendants' underwriting and other records.

79.    **Commonality and Predominance**: Common questions of law and fact predominate over any questions affecting only individual members of the Class.

80.    For Ms. Tripp and the Class, the common legal and factual questions include, but are not limited to the following:

---

[5] *See* CFPB Order, Exhibit C, at 4 (defining "Rate-Lock Affected Consumers" in relation to Wells Fargo's "established policy").

A.    What was the scope of the "systematic effort to wrongly offload the cost of" interest rate lock extensions described in Mr. Chavez's letter;

B.    What policies or procedures were in place to enact the systematic effort to charge borrowers Rate Lock Extension Fees;

C.    Whether Wells Fargo has engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices with the sale of its financial products;

D.    Whether Wells Fargo violated the federal statutes enumerated in the causes of action below;

E.    Whether Wells Fargo has been unjustly enriched or is liable for conversion;

F.    Whether Wells Fargo breached the implied covenant of good faith and fair dealing;

G.    Whether Wells Fargo misrepresented to Wells Fargo borrowers the nature of rate lock fees, or omitted key facts about those fees such as Wells Fargo's "borrower pays" model;

H.    Whether, because of Wells Fargo's conduct, Ms. Tripp and the Class have suffered damages; and if so, the appropriate amount thereof; and

I.    Whether, because of Wells Fargo's misconduct, Ms. Tripp and the Class are entitled to equitable and declaratory relief, and, if so, the nature of such relief.

81.    **Typicality**: Ms. Tripp's claims are typical of the claims of the members of the Class. Ms. Tripp and all the members of the Class have been injured by the same wrongful practices of Wells Fargo and Wells Fargo's de facto "borrower pays" policy. Ms. Tripp's claims

arise from the same practices and course of conduct that give rise to the claims of the members of the Class and are based on the same legal theories.

82.    **Adequacy**: Ms. Tripp is a representative who will fully and adequately assert and protect the interests of the Class, and has retained class counsel who are experienced and qualified in prosecuting class actions. Neither Ms. Tripp nor her attorneys have any interests contrary to or in conflict with the Class.

83.    **Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the claims of all members of the Class is economically unfeasible and procedurally impracticable. While the aggregate damages sustained by the Class are likely in the millions of dollars, the individual damages incurred by each Class member are too small to warrant the expense of individual suits. The likelihood of individual Class members prosecuting their own separate claims is remote, and even if every member of the Class could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases.

84.    Further, individual members of the Class do not have a significant interest in individually controlling the prosecution of separate actions, and individualized litigation would also result in varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all of the parties and the court system because of multiple trials of the same factual and legal issues. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action. In addition, Wells Fargo has acted or refused to act on grounds generally applicable to the Class and, as such, final injunctive relief or corresponding declaratory relief with regard to the members of the Class as a whole is appropriate.

85.    Wells Fargo has, or has access to, address and/or other contact information for the members of the Class, which may be used to provide notice of the pendency of this action.

## VI. TOLLING OF ANY APPLICABLE STATUTES OF LIMITATION

### A.  Discovery Rule

86.    Ms. Tripp and the Class members did not discover, and could not have discovered through the exercise of reasonable diligence, that Wells Fargo had a secret systematic effort to charge borrowers wrongful fees to extend mortgage interest rate-lock periods, or the fact that this systematic effort was contrary to Wells Fargo's own policy of bearing the fee when it was responsible for the failure of the loan to close.

87.    Wells Fargo's fraud was well-concealed. Due to the imbalance of power and, more importantly, the imbalance of knowledge between lender and borrower, Ms. Tripp and the Class did not discover Wells Fargo's systematic practice of wrongfully charging borrowers for rate lock extensions necessitated by the Bank's own delay.

88.    Indeed, Ms. Tripp and the Class had no way of knowing about Wells Fargo's scheme for the majority of its duration. *ProPublica* reported the first public information about that scheme on January 23, 2017 in an article specific to the Los Angeles area, and Wells Fargo did not provide any public information about the scope of the scheme until October 4, 2017. While the full scope of the scheme may still not be known, it came into clearer focus after the OCC and CFPB entered consent orders on April 2, 2018. Any statutes of limitation otherwise applicable to any claims asserted herein have thus been tolled by the discovery rule, and did not begin to run until October 4, 2017 at the earliest.

**B. Fraudulent Concealment**

89.     All applicable statutes of limitation have also been tolled by Wells Fargo's knowing, active, and ongoing fraudulent concealment of the facts alleged herein. When Wells Fargo entered loan agreements with rate lock clauses, it knew that its own lack of diligence was likely to cause closing delays and that it intended to charge borrowers for such delays—but Wells Fargo intentionally hid this systemic practice from Plaintiff and the Class.

90.     Despite internal whistleblowers like Mr. Chavez, Wells Fargo did not take action (or took insufficient action) to correct the problem, and publicly acknowledged the problem only when forced to do so by increasing scrutiny spurred by the *ProPublica* article. As a result of its unfair practices and concealment thereof, Wells Fargo ultimately received a cease and desist order from the OCC and has been assessed millions of dollars in penalties from the CFPB. Any otherwise applicable statutes of limitation have therefore been tolled by the Bank's exclusive knowledge and concealment of the facts alleged herein.

**C. Estoppel**

91.     Defendants were, and are, under a continuous duty to disclose to Ms. Tripp and the Class members the true cost of financing at Wells Fargo, including the likelihood that the Bank's delays would result in the borrower being charged a fee to extend their mortgage interest rate-lock period. Wells Fargo did not make that disclosure, and Ms. Tripp and the Class members reasonably relied upon the Bank's active concealment of these facts that rendered their statements misleading. Based on the foregoing, Wells Fargo is estopped from relying on any statutes of limitation in defense of this action.

## VII.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Real Estate Settlement Procedures Act, 12 U.S.C. § 2601, *et seq.*
### Asserted on Behalf of Plaintiff and the Class

92.     Ms. Tripp incorporates by reference every prior and subsequent allegation of this

Complaint as if fully restated here.

93.     The Real Estate Settlement Procedures Act ("RESPA") prohibits accepting

"unearned fees" including "any portion, split, or percentage of any charge made or received for

the rendering of a real estate settlement service in connection with a transaction involving a

federally related mortgage loan other than for services actually performed." 12 U.S.C. § 2607(b).

94.     In providing mortgages to Ms. Tripp and the Class, including in originating,

processing, underwriting, and funding such mortgages, Wells Fargo rendered real estate

settlement services—as that term is defined in RESPA, at 12 C.F.R. § 1024.2(b), and by courts—

in connection with a transaction involving a federally-related mortgage loan.

95.     A Rate Lock Extension Fee is a charge made or received for the rendering of a

real estate settlement service under RESPA. *See* 12 U.S.C. 2602(3) (settlement service "includes

*any service* provided in connection with a real estate settlement, including, but not limited to, …

the origination of a federally related mortgage loan (including, but not limited to, the taking of

loan applications, loan processing, and the underwriting and funding of loans), and the handling

of the processing, and closing or settlement") (emphasis added); 12 C.F.R. § 1024.2(b) (defining

settlement service with a non-exclusive list, including the "[o]rigination of a federally related

mortgage loan (including, but not limited to, the taking of loan applications, loan processing, and

the underwriting and funding of such loans)," "[p]rovision of any services related to the

origination, processing or funding of a federally related mortgage loan," and "any other services for which a settlement service provider requires a borrower or seller to pay").

96.    A Rate Lock Extension Fee (i.e. a fee to extend the *quoted* interest rate while origination is completed) is distinct from so-called "discount points" (i.e. additional amounts a borrower may pay up front in exchange for a *reduced* interest rate over the life of the loan). This distinction is reflected on Wells Fargo's mortgage website, which differentiates origination charges for "services performed"—including Rate Lock Extension Fees as shown in Wells Fargo's disclosures—from discount points:

> **What is an origination charge?**
>
> The origination charge is the amount charged for services performed on the initial loan application and loan processing. This includes all charges (other than discount points) that lenders and brokers involved in the transaction will receive for originating the loan. It includes any fees for application, processing, underwriting services, and payments from the lender for origination.

97.    The Rate Lock Extension Fees that Wells Fargo charged to Plaintiff and the Class were unearned settlement service fees. They were not bona fide compensation for services actually performed: Wells Fargo did not charge these fees to accommodate any borrower-caused delays. Instead, Wells Fargo charged these fees solely so that it could earn profit on its own systemic delays in the closing process for Plaintiff and the Class.

98.    Wells Fargo Home Mortgage (WFHM) and Wells Fargo Bank, N.A. are separate "persons" within the meaning of RESPA from Wells Fargo & Company. WFHM is based in Des Moines, Iowa, and is a discrete division of Wells Fargo Bank, N.A. Wells Fargo Bank, N.A., is a corporate subsidiary of Wells Fargo & Company.

99.    Wells Fargo & Co., Wells Fargo Bank N.A, and Wells Fargo Home Mortgage violated RESPA because, by accepting and dividing among themselves unearned Rate Lock

Extension Fees, these separate "persons" under RESPA gave or accepted a portion, split, or percentage of an unearned settlement service fee.

100.    WFHM provides retail mortgage lending services. WFHM and Wells Fargo Bank, N.A. obtain the Rate Lock Extension Fees from borrowers in the process of originating mortgage loans.

101.    These fees are initially collected by Wells Fargo Bank N.A.-operated branches. These branches are able to improve their profit and loss statements by charging borrowers those fees.

102.    After collecting some or all of the Rate Lock Extension Fees from the branches, Wells Fargo Bank, N.A. further shares or splits those unearned fees with its parent company, Wells Fargo & Company.

103.    Wells Fargo & Company funds loans originated by Wells Fargo Bank, N.A., and records revenue received by Wells Fargo Bank, N.A. in conjunction with those mortgage originations—including revenue from Rate Lock Extension Fees—as revenue to Wells Fargo & Company in its consolidated financial disclosures. For example, according to its 2017 financial statement, Wells Fargo & Company "originate[s], fund[s], and service[s] mortgage loans" and received roughly $2.1 billion in "net gains on mortgage loan origination/sales activities." *See also* Exhibit A (describing Wells Fargo & Co.'s provision of mortgage services).

104.    Wells Fargo & Company specifically reports mortgage and other loan-related fees as part of its noninterest income. For example, Wells Fargo & Company's 10-Q report for the quarter ending March 2018 reports noninterest income derived from "charges and fees on loans" and "net gains on mortgage loan origination/sales activities":

**Noninterest Income**

Table 2: Noninterest Income

| (in millions) | | Quarter ended March 31, | | % Change |
|---|---|---|---|---|
| | | 2018 | 2017 | |
| Service charges on deposit accounts | $ | 1,173 | 1,313 | (11)% |
| Trust and investment fees: | | | | |
| Brokerage advisory, commissions and other fees | | 2,403 | 2,324 | 3 |
| Trust and investment management | | 850 | 829 | 3 |
| Investment banking | | 430 | 417 | 3 |
| Total trust and investment fees | | 3,683 | 3,570 | 3 |
| Card fees | | 908 | 945 | (4) |
| Other fees: | | | | |
| Charges and fees on loans | | 301 | 307 | (2) |
| Cash network fees | | 126 | 126 | — |
| Commercial real estate brokerage commissions | | 85 | 81 | 5 |
| Letters of credit fees | | 79 | 74 | 7 |
| Wire transfer and other remittance fees | | 116 | 107 | 8 |
| All other fees | | 93 | 170 | (45) |
| Total other fees | | 800 | 865 | (8) |
| Mortgage banking: | | | | |
| Servicing income, net | | 468 | 456 | 3 |
| Net gains on mortgage loan origination/sales activities | | 466 | 772 | (40) |
| Total mortgage banking | | 934 | 1,228 | (24) |

On information and belief, these "charges and fees on loans" and "net gains on mortgage loan origination/sales activities" include revenue Wells Fargo & Company received from Rate Lock Extension Fees.

105.    By sharing these unearned Rate Lock Extension Fees among themselves, WFHM, Wells Fargo Bank, N.A., and Wells Fargo & Company are splitting or sharing a percentage of unearned settlement service fees in violation of RESPA.

106.    As a result of that splitting or sharing of unearned Rate Lock Extension Fees, Ms. Tripp and the Class are entitled to—and the Wells Fargo entities are jointly and severally liable for—damages of three times the amount of the Rate Lock Extension Fees plus interest, as well as attorney fees and costs. 12 U.S.C. § 2607(d).

///

///

COMPLAINT
28

## SECOND CAUSE OF ACTION
### Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*
### Asserted on Behalf of Plaintiff and the Class

107.    Ms. Tripp incorporates by reference every prior and subsequent allegation of this Complaint as if fully restated here.

108.    Congress passed the Truth in Lending Act ("TILA") to ensure that borrowers understood the true cost of consumer credit: "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a).

109.    One step TILA takes to accomplish that goal is requiring creditors to clearly and conspicuously disclose to borrowers the accurate and full terms of the legal relationship between creditors and consumer borrowers, like Ms. Tripp and the Class Members.

110.    TILA requires that creditors providing residential mortgages provide, among other things, disclosure of finance charges and fees, and a good faith estimate of the costs of closing a residential mortgage loan. 15 U.S.C. § 1638(a).

111.    Wells Fargo is a creditor under TILA. 15 U.S.C. § 1602(g).

112.    Wells Fargo violated TILA by failing to meaningfully and/or in good faith disclose finance charges and fees to borrowers who were charged Rate Lock Extension Fees, because Wells Fargo had a system under which it would charge borrowers finance charges/fees to extend the rate-lock period in cases of Bank-caused delay, increasing financing and/or closing costs in a way borrowers could not predict.

113.    Because Defendants systematically and wrongfully charged borrowers Rate Lock Extension Fees, any disclosure of those fees were not meaningful or adequate disclosures of:

A. "the aggregate amount of fees paid to the mortgage originator in connection with the loan, the amount of such fees paid directly by the consumer, and any additional amount received by the originator from the creditor[,]" 15 U.S.C. § 1638(a)(18); and/or

B. the finance charge, including but not limited to a charge similar to a loan fee or finder's fee. *Id.* § 1605(a)(3), § 1638(a)(3); 12 C.F.R. § 226.4(b)(3).

114. Ms. Tripp and the Class have been injured and have suffered monetary losses because of Wells Fargo's violations of TILA.

115. Ms. Tripp and the Class are therefore entitled to recover actual and/or statutory damages and attorney fees and costs from Wells Fargo, as provided by 15 U.S.C. § 1640(a).

### THIRD CAUSE OF ACTION
### Conversion
### Asserted on Behalf of Plaintiff and the Class

116. Ms. Tripp incorporates by reference every prior and subsequent allegation of this Complaint as if fully restated here.

117. Wells Fargo wrongfully converted from Ms. Tripp and the Class Members a specific, identifiable sum of money: the amount of their Rate Lock Extension Fees.

118. Ms. Tripp and the Class members own and had the right to possess that sum of money that Defendants wrongly demanded to extend the interest rate-lock period.

119. Defendants, without the right to do so, interfered with Ms. Tripp's and the Class members' possession of those sums of money by wrongfully charging fees to extend mortgage interest rate-lock periods, when delays in closing were the Bank's—not the borrowers'—fault.

120. Wells Fargo knew that in many instances its own dilatory conduct would create closing delays but that it would nonetheless charge borrowers for such delays. Wells Fargo also

intentionally concealed this fact from Ms. Tripp and the Class. Thus, any consent Defendants

obtained from Ms. Tripp and the Class to obtain Rate Lock Extension Fees was secured by fraud

and/or mistake, namely Wells Fargo's misleading statements about its Rate Lock Extension Fees

described herein and the concealment by Defendants from Ms. Tripp and the Class of the

*systematic effort* to wrongfully charge interest rate lock fees to borrowers.

121.    Ms. Tripp and the Class members also were coerced to pay the wrongful fees

under duress because if they did not, they risked (a) losing their locked interest rate, meaning

they would pay a significantly larger sum to finance their home purchase, or (b) losing the right

to purchase their homes, as well as any earnest payments, by walking away from the loan.

122.    Wells Fargo ensured that Ms. Tripp and the Class were stuck between a rock and

a hard place. Under these circumstances, the payments of Rate Lock Extension Fees were not,

and could not have been, truly voluntary.

123.    Defendants' wrongful taking of fees damaged Ms. Tripp and the Class members

in an amount that is capable of identification through Defendants' records.

### FOURTH CAUSE OF ACTION
### Breach of Implied Covenant of Good Faith and Fair Dealing
### Asserted on Behalf of Plaintiff and the Class

124.    Ms. Tripp incorporates by reference every prior and subsequent allegation of this

Complaint as if fully restated here.

125.    To secure a locked interest rate on a potential residential mortgage, Ms. Tripp and

the Class entered into contracts with Wells Fargo, under which contracts Ms. Tripp and the Class

members performed all material requirements. Wells Fargo acknowledges these as contracts—

what it calls "agreements"—in its online glossary of mortgage and home equity terms:

**Rate lock**
An agreement between the borrower and lender that holds the interest rate range, points, and term of the loan for a specific time period.

126.    Those contracts to "lock" interest rates are variously known as "Lock-In Agreements," "Price Range Protection" agreements, or something similar. Wells Fargo & Co. has also described these contracts as "commitments," as it did in its 2015 financial report to the SEC: "As part of our mortgage banking activities, we enter into commitments to fund residential mortgage loans at specified times in the future. A mortgage loan commitment is an interest rate lock that binds us to lend funds to a potential borrower at a specified interest rate and within a specified period of time, generally up to 60 days after inception of the rate lock."

127.    Those contracts provide that if a loan does not close on time, a customer may be permitted to extend their locked-in rate for a fee. This is an example of one such clause, from the Price Range Protection agreement Ms. Tripp received.:

This pricing is valid until the Expiration Date of Rate Lock shown above. If loan does not close and funds disbursed on or before the expiration date, your loan will be re-priced and this may result in pricing increases. However, at the option of Wells Fargo Bank, N.A., you may be permitted to keep your rate the same by paying an extension fee to extend the rate lock.

128.    Those clauses do not advise that Wells Fargo would also charge a fee to extend a rate lock where Wells Fargo caused the delay in closing beyond the expiration date pursuant to Wells Fargo's de facto "borrower pays" policy. In fact, the clauses are silent on the matter of who must bear the cost if Wells Fargo causes the closing delay.

129.    Like all contracts, however, Wells Fargo's "Lock-In Agreements" contain an implied covenant and duty on the parties to act in good faith and deal fairly with one another. This implied covenant supplements the express terms of the Lock-In Agreements, which do not explicitly state that a buyer shall be liable for a Rate Lock Extension Fee even if he or she did not

cause the closing delay. The implied covenant thus requires Wells Fargo to charge the Rate Lock Extension Fee only when it would be acting in good faith.

130.    In charging Ms. Tripp and the Class members a fee to extend their mortgage interest rate-lock periods as part of a systematic effort to impose such fees on faultless borrowers, Wells Fargo charged such fees in bad faith and breached its implied covenant and duty.

131.    In doing so, Wells Fargo acted contrary to the spirit and intention of its contract with borrowers, and did not act in a manner that comported with borrowers' objectively reasonable expectations. Wells Fargo knew that it had borrowers over a barrel: by charging a Rate Lock Extension Fee when it caused the closing delay, Wells Fargo intended to force Ms. Tripp and the Class members to (a) pay the wrongful fee; (b) pay a significantly larger sum to finance their home purchase; or (c) face a substantial risk that they would lose out on the home, as well as any earnest payment, by walking away from the loan.  Not only is this practice unfair, but it is contrary to borrowers' reasonable expectation that Wells Fargo would not charge a fee for inconveniencing them. An equally outrageous analogy would be an airline causing a long delay in returning checked baggage to passengers, only to turn around and charge passengers before they can take their bags home. Such practices are not fair and do not constitute good faith.

132.    Wells Fargo—not borrowers—knew of its systematic practice of charging fees to faultless borrowers, and used that to its advantage.  Wells Fargo exploited the imbalance of power and inequality of knowledge inherent in its relationships with borrowers, breaching its implied duty to act in good faith and deal fairly. Because of Wells Fargo's breach, Ms. Tripp and the Class have been harmed, including by foregoing the right to finance at the locked-in rate without having to pay an additional fee, and are entitled to all available damages.

## FIFTH CAUSE OF ACTION
### Fraud by Concealment
### Asserted on Behalf of Plaintiff and the Class

133.    Ms. Tripp incorporates by reference every prior and subsequent allegation of this Complaint as if fully restated here.

134.    Wells Fargo deceived Ms. Tripp and the Class members while providing consumer credit for the purchase or refinance of residential properties.

135.    While Wells Fargo disclosed some facts to Ms. Tripp and the Class members, including the fact that their mortgage interest rate lock could expire, Wells Fargo in a uniform way intentionally failed to disclose a related material fact of which it had exclusive knowledge: if Wells Fargo caused the expiration of the rate lock, it would charge borrowers a fee to extend that rate-lock period pursuant to its de facto "borrower pays" policy. That intentional failure to disclose and concealment of a material fact rendered Wells Fargo's partial disclosures deceptive.

136.    Wells Fargo also was under common law and statutory duties as an FDIC-insured provider of residential mortgage loans and servicing to disclose the true cost of borrowing to Ms. Tripp and the Class.

137.    Ms. Tripp and the Class members did not know, and could not have known, that the nation's largest residential mortgage lender systematically and wrongfully charged its borrowers for mortgage interest rate lock extensions. Wells Fargo did not provide that information, even after laying off several senior executives, hiring a law firm to conduct an internal review, and acknowledging an inquiry of the practice by a federal agency.

138.    Wells Fargo's representations about Rate Lock Extension Fees failed to disclose material facts. For example, Wells Fargo Home Mortgage's website discusses rate lock fees, but

does not discuss that Bank-caused delays may result in borrowers paying such fees at the end of the rate-lock period:



139.    Wells Fargo also represents on its website that "closing generally occurs within the rate-lock period you've chosen":



140.    By not informing Ms. Tripp and other borrowers who locked interest rates that Wells Fargo would charge them fees to extend those rate locks when Wells Fargo caused a delay in closing, Wells Fargo intended to deceive borrowers, so that they would rely on Wells Fargo for financing, and so Wells Fargo could remain the nation's largest home lender.

141.    Ms. Tripp and the Class members reasonably relied on Wells Fargo's half-truths and omissions. The Bank holds itself out as the nation's largest residential lender, and Ms. Tripp and the Class members could assume that the nation's largest lender would be able to complete the financing process in the given rate-lock period, would not charge borrowers fees when the Bank could not, and operated under a de facto "borrower pays" policy.

142.    Had Ms. Tripp and the Class known about the practice, they would not have applied to Wells Fargo for residential financing. No reasonable person would.

143.    Because of the Bank's deceptive statements, Ms. Tripp and the Class were harmed by paying fees that they should not have been required to pay to complete the financing or refinancing of their home loans. The Bank's system centered on wrongful fees and the concealment of that system through half-truths were substantial factors causing that harm.

144.    Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with the intent to defraud; in reckless disregard of the rights of Ms. Tripp and the Class; and to enrich themselves. Their misconduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount shall be determined according to proof at trial.

## SIXTH CAUSE OF ACTION
### Violations of the Oregon Unlawful Trade Practices Act, Or. Rev. Stat. §§ 646.605, *et seq.* Asserted on Behalf of Plaintiff and Oregon Class Members

145.    Ms. Tripp incorporates by reference every prior and subsequent allegation of this Complaint as if fully restated here.

146.    Ms. Tripp (for the purpose of this section, "Plaintiff") brings this cause of action on behalf of herself and the Oregon Class Members.

147.    Plaintiff and the Oregon Class Members are "persons" within the meaning of Or. Rev. Stat. § 646.605(4).

148.    Wells Fargo is engaged in "trade" or "commerce" within the meaning of Or. Rev. Stat. § 646.605(8). Wells Fargo's rate lock agreements and rate lock extensions are "real estate, goods or services" under the Oregon Unfair Trade Practices Act ("Oregon UTPA"), which prohibits "unlawful practice . . . in the course of . . . business." Or. Rev. Stat. § 646.608(1).

149.    In the course of its business, Wells Fargo willfully engaged in the following unlawful practices, as described in this Complaint, in violation of Or. Rev. Stat. § 646.608(1):

- representing that its rate lock services have sponsorship, approval, characteristics, ingredients, uses, benefits, quantities, or qualities that they do not have, because Wells Fargo followed a "borrower pays" model under which a borrower's rate lock service would be worthless unless that borrower subsequently paid a Rate Lock Extension Fee, *id.* § 646.608(1)(e);

- advertising rate lock services with the intent not to sell them as advertised, *id.* § 646.608(1)(i);

- representing that borrowers will receive a rebate or discount or value to a borrower— namely, a "locked" interest rate for their closing period—where the earning of that benefit could only be obtained if the borrower later paid a Rate Lock Extension Fee, *id.* § 646.608(1)(o);

- promising to deliver real estate, goods, or services within a certain period of time—the rate-lock period—with the intent not to deliver the real estate, goods, or services as promised, *id.* § 646.608(1)(q);

- making false or misleading representations of fact concerning the offering price of, or the person's cost for, real estate, goods, or services, by not informing borrowers that they would be required to pay a Rate Lock Extension Fee for Bank-caused delays *id.* § 646.608(1)(s);

- failing to deal with borrowers in good faith under OAR 137-020-0805, *id.* § 646.608(1)(u); and

- engaging in the other unfair or deceptive conduct in trade or commerce by violating federal law as described in this Complaint, and Regulation N, "Mortgage Acts and Practices—Advertising," which forbids "any person to make any material misrepresentation, expressly or by implication, in any commercial communication, regarding any term of any mortgage credit product[.]" 12 C.F.R. § 1014.3. The non-exclusive list of prohibited representations in that regulation includes the "existence, nature, or amount of fees or costs to the consumer associated with the mortgage credit product, including but not limited to misrepresentations that no fees are charged[.]" *Id.* § 1014.3(c). Wells Fargo violated Regulation N by making the following express or implied material misrepresentations about its rate lock agreements: omitting that it had a scheme to charge faultless borrowers fees to extend their rate locks where the Bank caused delays; omitting that a customer would be charged a fee to extend their his or her rate lock even if that customer provided all information required by the Bank; and omitting that the Bank was experiencing excessive delays which that would likely require an extension of the rate lock, for which the customer would be charged

150.    Wells Fargo's misrepresentations included failure to disclose facts, including that it had a de facto "borrower pays" policy. Wells Fargo's scheme and concealment of the true

characteristics of its Rate Lock Agreements were material to Plaintiff and the Oregon Class Members, who relied Wells Fargo's misrepresentations, half-truths, and omissions as Wells Fargo intended. Had they known the truth, Plaintiff and the Oregon Class Members would not have used Wells Fargo to obtain financing.

151.    Plaintiff and the Oregon Class Members had no way of discerning that Wells Fargo's representations and omissions were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Wells Fargo did not disclose that it had two rate-lock policies: a written policy under which the Bank would pay for Rate Lock Extension Fees, and the "borrower pays" de-facto policy. Plaintiff and the Oregon Class Members did not, and could not, unravel Defendants' deception on their own.

152.    Defendants had an ongoing duty to Plaintiff and the Oregon Class Members to refrain from unfair and deceptive practices under the Oregon UTPA in the course of their business. Specifically, Wells Fargo had a duty to disclose that its loan officers were following a de facto "borrower pays" policy since at least 2013, and that when a borrower "locked" their interest rate it was likely that would need to pay a fee to extend that lock when the Bank predictably delayed the closing process. Wells Fargo's misrepresentations, half-truths, and omissions were misleading because they were contradicted by withheld facts, as Wells Fargo knew or should have known.

153.    Wells Fargo's misrepresentations, half-truths, and omissions directly and proximately caused Plaintiff and the Oregon Class Members ascertainable losses and actual damages.

154.    Defendants' violations present a continuing risk to Plaintiff and the Oregon Class Members, as well as to the general public. Wells Fargo's unlawful acts and practices complained of herein affect the public interest.

155.    Pursuant to Or. Rev. Stat. § 646.638, Plaintiff and the Oregon Class Members seek an order enjoining Wells Fargo's unfair and/or deceptive acts or practices, and awarding actual or statutory damages, punitive damages, fees, and any other just and proper relief available under the Oregon UTPA.

### SEVENTH CAUSE OF ACTION
### Unjust Enrichment
### Asserted on Behalf of Plaintiff and the Class

156.    Ms. Tripp incorporates by reference every prior and subsequent allegation of this Complaint as if fully restated here.

157.    Wells Fargo made false representations, and omitted key facts, about its "borrower pays" policy with the intent of inducing Plaintiff and the Class to pay Rate Lock Extension Fees.

158.    As described above, Wells Fargo obtained a benefit from the collection of those wrongful Rate Lock Extension Fees because it was substantially enriched by the collection of those unfairly obtained fees.

159.    Wells Fargo aware that it was unfairly receiving that benefit because since at least 2013 it knew it was following a de facto "borrower pays" policy, not its written policy on only charging borrowers fees in cases of borrower-caused delay.

160.    Permitting Wells Fargo to retain those fees would be unjust because they were obtained as the result of unlawful, unfair, or fraudulent practices. Wells Fargo should have

expected to pay that fee itself, and permitting Wells Fargo to charge faultless borrowers would defeat society's reasonable expectations in a mortgage loan transaction.

161.    Plaintiff and the Class are therefore entitled to restitution of those wrongful fees and all other available relief.

## VIII.   REQUEST FOR RELIEF

162.    Plaintiff Tripp, individually and on behalf of all others similarly situated, requests judgment against Defendants as follows:

163.    For an order certifying the Class and, under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), appointing Plaintiff as representative of the Class and appointing the lawyers and law firm representing Plaintiff as counsel for the Class;

164.    Declaring Wells Fargo's actions to be unlawful;

165.    In the alternative to legal remedies, injunctive relief, including public injunctive relief permanently enjoining Wells Fargo from performing further unfair and unlawful acts as alleged herein;

166.    For all recoverable compensatory, statutory, and other damages sustained by Plaintiff and the Class, including disgorgement, unjust enrichment, and all other relief allowed under applicable law, including punitive damages to punish Wells Fargo's behavior and deter similar behavior;

167.    Granting Plaintiff and the Class awards of restitution and/or disgorgement of Wells Fargo's profits from its unfair and unlawful practices described above;

168.    For costs;

169.    For both pre-judgment and post-judgment interest on any amounts awarded;

170.    For treble damages insofar as they are allowed by applicable laws;

171.    For appropriate individual relief as requested above;

172.    For payment of attorneys' fees and expert fees as may be allowable under applicable law; and

173.    For such other and further relief, including declaratory relief, as the Court may deem proper.

## IX. DEMAND FOR JURY TRIAL

174.    Plaintiff hereby demands a trial by jury on all issues so triable.

DATED this 4th day of June, 2018.

KELLER ROHRBACK L.L.P.


By */s/ Matthew J. Preusch*
Matthew J. Preusch (Bar No. 134610)
**KELLER ROHRBACK L.L.P.**
801 Garden Street, Suite 301
Santa Barbara, CA 93101
(805) 456-1496; Fax: (805) 456-1497
mpreusch@kellerrohrback.com

Derek W. Loeser, *pro hac vice forthcoming*
Gretchen Freeman Cappio*, pro hac vice forthcoming*
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
(206) 623-1900; Fax: (206) 623-3384
dloeser@kellerrohrback.com
gcappio@kellerrohrback.com

***Attorneys for Plaintiff***

# Exhibit A



Newsroom     News Releases     Wells Fargo Announces Plan to Refund Customers for Mortgage Rate Loc

# Wells Fargo Announces Plan to Refund Customers for Mortgage Rate Lock Extension Fees

Posted In: Consumer Lending
October 4, 2017

SAN FRANCISCO--(BUSINESS WIRE)--Wells Fargo & Company (NYSE: WFC) today announced plans to reach out to all home lending customers who paid fees for mortgage rate lock extensions requested from Sept. 16, 2013, through Feb. 28, 2017, and to refund customers who believe they shouldn't have paid those fees. The company previously disclosed that it was reviewing past policies and procedures regarding the circumstances in which mortgage rate lock extension fees were assessed to customers, and Wells Fargo CEO Tim Sloan mentioned the refund plans during an appearance Tuesday, Oct. 3, before the U.S. Senate Committee on Banking, Housing and Urban Affairs.

In making today's announcement, Sloan said, "We want to serve our customers as they would expect to be served, and are initiating these refunds as part of our ongoing efforts to rebuild trust."

The plan to issue refunds follows an internal review that determined a rate lock extension policy implemented in September 2013 was, at times, not consistently applied, resulting in some borrowers being charged fees in cases where the company was primarily responsible for the delays that made the extensions necessary. Effective March 1, 2017, Wells Fargo changed how the company manages the mortgage rate lock extension process to ensure more consistency by establishing a centralized review team that reviews all rate lock extension requests for consistent application of policy.

The company anticipates that the first customer communications and refunds will go out in the final quarter of this year. A total of approximately $98 million in rate lock extension fees were assessed to about 110,000 borrowers during the period in question, although the company believes a substantial number of those fees were appropriately charged under its policy. The amount ultimately refunded likely will be lower, as not all of the fees assessed were actually paid and some fees already have been refunded.

### About Wells Fargo

Wells Fargo & Company (NYSE: WFC) is a diversified, community-based financial services company with $1.9 trillion in assets. Wells Fargo's vision is to satisfy our customers' financial needs and help them succeed financially. Founded in 1852 and headquartered in San Francisco, Wells Fargo provides banking, insurance, investments, mortgage, and consumer and commercial finance through more than 8,500 locations, 13,000 ATMs, the internet (wellsfargo.com) and mobile banking, and has offices in 42 countries and territories to support customers who conduct business in the global economy. With approximately 271,000 team members, Wells Fargo serves one in three households in the United States. Wells Fargo & Company was ranked No. 25 on Fortune's 2017 rankings of America's largest corporations. News, insights and perspectives from Wells Fargo are also available at Wells Fargo Stories.

### Cautionary Statement About Forward-Looking Statements

This news release contains forward-looking statements about our future financial performance and business. Because forward-looking statements are based on our current expectations and assumptions regarding the future, they are subject to inherent risks and uncertainties. Do not unduly rely on forward-looking statements as actual results could differ materially from expectations. Forward-looking statements speak only as of the date made, and we do not undertake to update them to reflect changes or events that occur after that date. For information about factors that could cause actual results to differ materially from our expectations, refer to our reports filed with the Securities and Exchange Commission, including the discussion under "Risk Factors" in our Annual Report on Form 10-K for the year ended December 31, 2016, as filed with the Securities and Exchange Commission and available on its website at www.sec.gov.

**Contact:**

**Media**
Tom Goyda, 314-875-8222
or
**Investors**
John Campbell, 415-396-0523

**Newsroom**

News Releases
Company Overview
Financial Information
Multimedia Resources
Wells Fargo Stories
Corporate Social Responsibility
Advanced Search

‡ We provide links to external websites for your convenience. Wells Fargo does not endorse and is not responsible for their content, links, privacy policies, or security policies.

© 1999 - 2018 Wells Fargo. All rights reserved. NMLSR ID 399801

Business Wire NewsHQ℠

Exhibit B

Frank A. Chavez

109 East Ramona Road
Alhambra, CA 91801
home: (626) 284-7081
cell: (310) 651-1267
frankachavez00@gmail.com

November 23, 2016

U.S. House Committee on Financial Services Democrats
4340 Thomas P. O'Neill, Jr. Federal Office Building
Washington, DC 20515

U.S. Senate Committee on Banking, Housing, and Urban Affairs
534 Dirksen Senate Office Building
Washington, D.C. 20510

RE: IMPROPER/FRAUDULENT CHARGING of INTEREST RATE LOCK EXTENSION
FEES to BORROWERS by WELLS FARGO HOME MORTGAGE

Dear Representatives and Senators,

This is to inform members of Congress and others regarding a systematic effort on the
part of area and regional management of Wells Fargo Home Mortgage in at least the
Greater Los Angeles area to pass on the cost of Interest Rate Lock Extensions on
pending conventional and jumbo mortgage loan applications which Wells Fargo should
have paid out of its own pocket rather than the bank's borrowers/customers over a
period of approximately two years.

We are talking about millions of dollars, in just the Los Angeles area alone, which were
wrongly paid by borrowers/customers instead of Wells Fargo. Though the practice I will
attempt to outline below is more complicated and less intuitive than the Fraudulent
Account Opening Scandal of earlier this year, I believe the damage done to Wells Fargo
mortgage customers in this case is much, much more egregious.

My name is Frank Chavez, and I worked at Wells Fargo in various capacities from
November 2005 until April 2016. I began as a retail banker in a branch. By September
2011, I was working in the Private Mortgage Banking (PMB) group of Wells Fargo Home
Mortgage (WFHM) at its Beverly Hills office. I resigned this last April of 2016.

I will attempt to describe and outline an otherwise slightly confusing subject and timeline
in a way that the average American consumer can understand without having
sophisticated banking or mortgage lending experience. I will provide the names of some

specific managers involved with this systematic effort to wrongly offload the cost of those Interest Rate Lock Extensions onto borrowers and the efforts they made to protect themselves (management) while attempting to lay blame on the lower level sales employees in the event of a future scandal. I will also try to provide additional information that may help to further investigate and document this improper activity (mostly to be found through subpoenas of internal Wells Fargo emails).

The time period related to the improper behavior that I will outline covers approximately the beginning of 2014 through about beginning of 2016. Though the exact process of management's systematic efforts during this period varied, the goal was ultimately to burden the borrowers/customers with the Interest Rate Lock Extension fees that should have otherwise hit the bank's own financial statements.

I have attached a customer complaint letter dated June 29, 2015 (Attachment A) which was sent to the now former head of Wells Fargo Home Lending, Mike Heid, and to then CEO John Stumpf. Coincidentally, Mike Heid's retirement was announced shortly after in August 2015. The attached letter alludes to the interest rate lock extension practice described below on the part of area and and regional management, and demonstrates that then CEO John Stumpf was either aware of a problem or should have been aware of unusual behavior as of June 2015.

A combination of a series of newly implemented financial regulations, WFHM's self imposed process changes and Wells Fargo's "expense reductions" (a.k.a. employee firings) from 2012 through 2015 lead to a gradually increasing standstill and backlog of mortgage loan applications within the underwriting and loan closing process.  These mostly self-imposed structural and procedural changes (along with some other internal, non-customer related inefficiencies) caused the mortgage loan application process to go well beyond the interest rate lock periods of 45 or 90 days.  Though almost all types of loans were affected (conventional conforming, jumbo, purchase and refinances), the loan applications that were probably most affected were refinance loans both conforming and jumbo.

It became apparent by at least mid-2014 that area management of Wells Fargo's PMB division in Los Angeles was making a concerted effort to find any way possible to lay any & all blame for delays in the mortgage loan application process into the laps of borrowers/customers so that they could rationalize having the customers pay for the Interest Rate Lock Extension fees that would allow the borrowers to keep the interest rates that were locked-in at the beginning of the loan application process. Both the PMB Area Manager in Los Angeles, Kenneth (Ken) Vils, and the Regional WFHM Manager, Tom Swanson, overseeing both the retail home mortgage lending and PMB lending in the Los Angeles region were the primary individuals leading the systematic effort in Los Angeles to shift this specific financial burden onto borrowers/customers.

Of course, there were instances when borrowers would drag their feet in collecting and providing the requested or required financial documentation needed for underwriting and/or loan closing. The vast majority of delays, though, were caused by either by front

line home mortgage consultants (HMC's) or PMB sales team members, underwriting backlogs, loan processing backlogs, other circumstances outside the control of the customer/borrower or some combination thereof.

The three most blatant methods of attempting to transfer blame onto customers for past and expected future delays in the mortgage process were:

>   (1.) Having the underwriter stop the "Reg B clock" and note the file for "missing" customer documentation or information that had already been provided by the borrower and which was available to the underwriter for review. This is known as an AIRL.
>   (2.) Having loan processors and loan closers note (aka AIRL) the file for "missing" customer documentation or information that had already been provided by the borrower.
>   (3.) Rationalizing HMC or PMB banker delays in requesting and/or submitting customer/borrower documents, info or forms as "customer-caused" or "customer-related" delays. This is probably one of the more obvious and egregious of the improper activities, as it treated the HMC or PMB Banker as an extension of the customer rather than as an WFHM or WFHM PMB employee proper.

These three methods of systematically and wrongly shifting the blame for delays onto the customer can be evidenced by internal emails between: frontline HMC's or PMB mortgage bankers; the Los Angeles PMB Area Manager, Ken Vils; Regional WFHM Manager, Tom Swanson; Regional Processing Manager, Heidi Schlagel; and various branch managers throughout the Los Angeles area. PMB Bankers were instructed to send specifically structured/worded emails to one or more of the above managers (depending on the situation) requesting approval for needed Interest Rate Lock Extensions.

Subject lines of emails to and from the individual managers listed above will indicate certain words or phrases that may serve as starting points for possible initial reviews of internal emails related to the matter. Searches through internal emails to and from the above mentioned managers will likely be most fruitful during the periods covering early 2014 through early 2016.

A newly implemented loan origination & processing system called "CORE" (I cannot recall for what the acronym stands), which began to control the mortgage process in a more automated fashion by early 2016, may have reduced the number of Interest Rate Lock Extension requests in general and the frequency of improperly charging borrowers/customers the thousands of dollars per loan that should have otherwise been paid from the Bank's own balance sheet. Nonetheless, those reading this will find that during early 3014 through early 2016, the Bank made a concerted effort to wrongly pass the cost on to the consumer/borrower for costs that the Bank should have paid. This was wrong and known to middle management and executive management. The

attempt by middle management to protect themselves from liability was also apparent by June 2015 (as demonstrated by the attached complaint letter).

To illustrate how this business practice could easily and wrongly burden the Los Angeles County consumer (alone) in the millions of dollars, I will demonstrate a hypothetical Refinance Loan scenario for a conventional conforming mortgage loan which would be typical for a Wells Fargo customer/borrower in Los Angeles County.

> EXAMPLE - Conventional-Conforming Refinance Loan:
> Loan Type: Conventional Refinance
> Collateral: Single Family Home - Primary Residence
> Loan Amount: $417,00
> Interest Rate:: 4.000%
> Interest Rate Lock Period: 90-day

A customer approaches a Wells Fargo employee regarding a mortgage refinance of their primary residence.  The customer finds themselves in front of a Private Mortgage Banker (PMB Banker) initiating a refinance mortgage loan application on their  primary residence.  The PMB banker will more likely than not quote the customer the currently offered mortgage interest rate for the customer's given circumstance.  Next, we'll say that the customer agrees to the interest rate and initiates an Interest Rate Lock with the HMC or the PMB Banker.  At this point, the quoted interest rate is locked-in and   the loan has to close within 90-days in order to avoid the cost of extending the offered and locked-in mortgage interest rate to the customer.  If the loan isn't closed and funded by the time the 90 days are over, and the offered interest rate for the customer's given circumstance has increased, then the borrower or the bank will have to pay a percentage of the loan amount in order to extend the promised rate for 15-days to allow the loan process to complete itself as well as provide the promised rate to the borrower.

This is when the HMC or PMB Banker should begin to request, either in writing or verbally, all the required documentation from the borrower that will be needed for underwriting of the home mortgage loan.  Again & although there are always individual borrowers who "drag their feet" in providing the required documentation in order for the Bank to in good faith meet the Reg B deadline, my experience has been that the vast majority (an exact %, I do not know) of borrowers provide the required documentation needed to make an underwriting decision within the Ref B deadline of 30 days.

Now, assuming that the customer/borrower has continued to provide everything requested of them.  The delays that will begin to manifest are those on the part of the individual HMC or PMB Banker, underwriter(s), processing department and/or 3rd party vendors (escrow, tile, appraisers, insurance agents, etc.).  None of these are, for the most part, the fault of the customer/borrower.

We've now arrived at the 90-day mark and, because of one or more reasons, have not met all the mortgage loan milestones required in order to close and fund the loan within the 90-day period of the Interest Rate Lock initiated at the beginning of the loan application. The cost of extending the Interest Rate Lock of 4.000%% for 15 days (in order to let the loan close at the promised interest rate) will be 0.250% of the loan amount. The math follows as such: 0.250% of $417,000 is $1,042.50. Now, either the Bank or the Borrower/Customer will have to pay this dollar amount, depending on who caused the delays.

As I stated above, the vast majority of Wells Fargo borrowers/customers provided the necessary documentation within a reasonable amount of time for the Bank to not only in good faith meet the Reg B deadline of 30 days but also meet 90-day Interest Rate Lock deadline.

The Interest Rate Lock Extension must now be requested by the HMC or PMB Banker in an email to any one or more of the managers previously listed. The exact individual to whom the request is sent will depend on when the request was made during the subject two-year period. Generally speaking, though, the vast majority of these email requests for approval of Interest Rate Lock Extensions will have involved Ken Vils (PMB Area Manager) and/or Tom Swanson (Regional WFHM Manager).

There are two (2) aspects to an emailed Interest Rate Lock Extension approval request that would be sent to whomever has been designated as the appropriate manager:

1. The first aspect is simply the request and subsequent approval to extend the locked-in rate for another 15-days.
2. The second aspect relates to whom (Borrower vs Bank) should or will pay for the 0.250% of the loan amount or $1,042.50 (in the above scenario). Please note that the cost of an Interest Rate Lock Extension for a Jumbo Loan would be 0.125% of the loan amount.

This is a very critical part of what I am trying to convey to Congress and regulators. In the body of the emailed requests for interest rate lock extension approvals, Ken Vils and Tom Swanson required PMB Bankers to provide a timeline of events such as:

- NSD Date - Day 0 of the loan application and Regulation B clock
- Date the Interest Rate Lock was initiated
- Date Borrower documents were requested (i.e. tax returns, bank statements, letters of explanation, etc.)
- Date Borrower documents were obtained
- Date which loan application was sent to underwriting
- Date various regulatory and/or internal forms were obtained and submitted to underwriting or processing departments
- Date when a Credit Decision was made (approve, deny, or any AIRL's)
- Explanation for any/all delays by any of the parties (Borrower, Banker, Underwriter, Processor, 3rd party vendors, etc.)

I mention what would be detailed in an email request for an Interest Rate Lock Extension approval because the information would aid investigators in a more precise search of internal emails and evidence how HMC's and PMB Bankers tried to argue (to no avail) on behalf of borrowers/customers to WFHM management in the Los Angeles area. These internal emails will show (along with other emails and loan application records) that many, if not most, delays were caused by bank employees or 3rd party vendors and NOT by the Borrower/Customer.

The attached complaint letter (Attachment A - section titled "*Unprofessional Call from Mr. Joshua Isaac Oleesky*") demonstrates how Tom Swanson enlisted the help of a very loyal Private Mortgage Banking branch manager, Joshua Oleesky, in making telephone calls directly to borrowers/customers who had been, or were going to be, charged the fees for the interest rate lock extensions. Under the organizational structure and protocol of WFHM at that time, there was absolutely no reason for Mr. Oleesky to be the one to directly contact borrowers/customers of HMC's or PMB bankers who did not report directly to him as a branch manager.

These phone calls were an attempt to "document" whether or not HMC's or PMB bankers had informed the loan applicants of the interest rate lock extension fees that were charged to them. These calls by Joshua Oleesky appeared to be an organized and concerted effort specifically on the part of Tom Swanson to protect himself and other managers by laying blame on frontline employees and/or convince the borrowers that they were to blame for the delays that caused the need for any interest rate lock extensions and related fees.

I hope you have taken the time to read through this letter and are able to see, given the market share and number of mortgage loans Wells Fargo Home Mortgage originates in Los Angeles County and the rest of the nation, how this practice of wrongly charging borrowers/customers for these Interest Rate Lock Extension Fees can easily and quickly total into the millions of dollars. I can only speak to my experience with Wells Fargo Home Mortgage in the Los Angeles region. Given the corporate culture nurtured by John Stumpf throughout Wells Fargo Bank, N.A., though, I can't imagine that similar behaviors regarding Interest Rate Lock Extensions Fees did not occur in other regions throughout the nation during the same period.

If you have any questions or concerns, I may be reached by phone or email and would be more than happy to assist in any way possible.

Very respectfully,

Frank Antonio Chavez

# ATTACHMENT A

June 29, 2015

Mr. Mike Heid, President
Wells Fargo Home Mortgage
P.O. Box 10335
Des Moines, IA 50306-0335

Subject:        Complaints (2) and Request for Refund

Reference:      Refinance Application, Loan No. 0112204136

Dear Mr. Heid:

We are writing to express our disappointment with Wells Fargo Bank in its response to
our recent application to refinance the reference loan. Wells Fargo decisions made in
underwriting this loan were incorrect and we were offended by a very unprofessional call
we received from Mr. Joshua Isaac Oleesky, Assistant Vice President Wells Fargo Home
Mortgage. Additionally, we are requesting a refund of the appraisal fee we paid to Wells
Fargo at the offset of our application. A summary or the facts follow:

**Refinance Loan Application:**

1. We contacted Mr. Keith Prendergast regarding this refinance on March 03, 2015.
   We noted our finances and residency situation are complicated but after providing
   significant preliminary information, Mr. Prendergast said he felt Wells Fargo
   would be able to do the refinance. We had lower quoted from Kinecta Federal
   Credit Union and Chase with whom we are private clients but moved forward
   with Wells Fargo because you hold the existing loan and the past good service
   provided by Mr. Prendergast.

2. Wells Fargo requested volumes of documentation and numerous letters of
   explanation which we promptly provided upon request. Around the end of May,
   an underwriting decision was that this was not our principal residence! Mr.
   Prendergast offered investor financing at a higher rate. We said we would accept
   the higher rate but Wells Fargo must reduce the loan cost as compensation for the
   delay, and, in our view, erroneous underwriting decision.

3. To briefly explain the complexities of our financial and residency situation, we
   offer the following:

   a. We are financially strong with a net worth of over $6.5(M), substantial
      liquidity, gross income of over $250K a year, and FICO scores over 800.

   b. Our Children live in Las Vegas and Manhattan Beach. ███████████
      ███████ Las Vegas (subject of refinance) is our primary residence. We

have lived in this home since 2008, our home has been in Las Vegas since 1999, we have also been Nevada residents since 1999, Nevada is our tax home (see our 1040 on file with WF), and our vehicles and drivers licenses are registered to ███████████ We have a secondary home at ██████████ Manhattan Beach that we share with our daughter, Jennifer, her husband, and their young son (our grandson). They leased out their home and give us the rent from that property.

c. Because we travel a lot, our daughter, Loretta, her husband, and their young son (our grandson) have lived with us at our Las Vegas home (subject of refinance) since 2009. Loretta and her husband leased out their home and give us the rent from that property. This is an ideal family/financial/security situation. The sharing arrangements for both homes are documented by a signed lease agreements and our Schedules E.

d. We travel a lot due to business, leisure and family. We use a PO Box address in Manhattan Beach for rent payments and so our eldest daughter can receive our mail when we are away. However, the subject property is our principal residence and where we will retire once we fully retire (been trying to do that since 2007).

e. Finally, Wells Fargo underwriting's decision is illogical. We do not have any other residences and the subject property is our primary residence (home). It happens that our family members live with us. If they did not pay rent, the underwriting question would have been moot. Because our daughter and her family has chosen to contribute to household expenses, that makes the house an investment property and not our principal residence??? Not well founded logic!

4. Although Mr. Prendergast did a superb job of communicating and keeping us informed, explaining additional requirements, and transmitting documents to your underwriting team; we got the feeling Wells Fargo underwriting was not capable of analyzing our admittedly complicated situation and took the easy way out by saying no. Further the amount of time it took to get to this decision is unacceptable.

5. As a result of a call from Mr. Oleesky on June 12, 2015, it became obvious refinancing with Wells Fargo had no financial benefit and we advised Mr. Prendergast we would not accept the higher interest rate. We understand the loan application has been closed.

## Unprofessional call from Mr. Joshua Isaac Oleesky:

1. On June 12, 20155, Mr. Oleesky called me, advised that he was Mr. Prendergast's manager and asked if Mr. Prendergast had advised me of substantial cost of the extended rate locks. I advised him that Wells Fargo was responsible for the delays that caused the extension of the rate locks and I would not be paying any additional cost. Further, I told him I had advised Mr. Prendergast that we would only be interested in the higher interest rate if Wells Fargo substantially reduced our loan cost (this was done verbally and in 2 emails).

2.  Mr. Oleesky then started interrogating me on why Wells Fargo was responsible
    for the delay. I suggested he look at the documentation on file and the
    correspondence that had transpired. Mr. Oleesky was very condescending verging
    on rude. He said I seemed like an intelligent person and asked me to put myself in
    the shoes of the underwriter and tell him what I would decide. I politely asked Mr.
    Oleesky to send me his contact information and that the conversation was over.
    He again asked me something to the effect of "is it correct that Mr. Prendergast
    did not tell you about the cost of the additional rate locks". I told him to look at
    Wells Fargo's files and bid him a polite good-bye.

3.  Mr. Oleesky's call was offensive and unprofessional. Basically, he was
    questioning the integrity of a fellow team member (Mr. Prendergast). In my world
    it is inappropriate to transmit internal criticisms beyond the team and, especially
    to a customer. I suggest Mr. Oleesky be coached on teamwork and customer
    communications and hope no more than that happens.

4.  Finally, we have nothing but praise for the way Keith dealt with working through
    the details of our situation.

**Request for Refund:**

As noted, we believe Wells Fargo took too long to process our application and took
the easy way out with an unreasonable underwriting determination on our refinance.
This is our principal residence and we do not understand how an underwriter can
make a decision to the contrary. Therefore, we request a refund of the appraisal fee
we paid in advance of the erroneous underwriting.

Thank you.

cc:    Mr. John G. Stumpf, Wells Fargo CEO, John.G.Stumpf@wellsfargo.com
       Mr. Keith A. Prendergast, keith.a.prendergast@wellsfargo.com
       Mr. Joshua Isaac Oleesky, joshua.i.oleesky@wellsfargo.com
       Mr. Mark Merkerdichian, mark.mekerdichian@wellsfargo.com

# Exhibit C

# UNITED STATES OF AMERICA
# BUREAU OF CONSUMER FINANCIAL PROTECTION

**ADMINISTRATIVE PROCEEDING**
**File No. 2018-BCFP-0001**

| | |
|---|---|
| **In the Matter of:** | **CONSENT ORDER** |
| **WELLS FARGO BANK, N.A.** | |

The Bureau of Consumer Financial Protection (Bureau) has reviewed aspects of the following conduct of Wells Fargo Bank, N.A. (Respondent, as defined below): (1) charging fees for rate-lock extensions in connection with residential-mortgage lending; and (2) force-placing collateral-protection insurance (Force-Placed Insurance, as defined below) on consumers' vehicles for auto loans that it originated or acquired. The Bureau has identified the following violations of law: (1) Respondent unfairly failed to follow the mortgage-interest-rate-lock process it explained to some prospective borrowers; and (2) Respondent operated its Force-Placed Insurance program in an unfair manner. The Bureau issues this Consent Order (Consent Order) under authority granted by §§ 1053 and 1055 of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5563, 5565.

Respondent has previously identified and reported to the Bureau certain information about the deficiencies described in this Consent Order. Respondent has discontinued the practices that led to the deficiencies, including, as of September 30, 2016, the placement of Force-Placed Insurance, as defined below. Further, Respondent

has begun voluntarily providing remediation to consumers to address certain of the deficiencies cited in this Consent Order.

## I.

## Jurisdiction

1.    The Bureau has jurisdiction over this matter under §§ 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565.

## II.

## Stipulation

2.    Respondent has executed a "Stipulation and Consent to the Issuance of a Consent Order," dated April 19, 2018 (Stipulation), which is incorporated by reference and is accepted by the Bureau. By this Stipulation, Respondent has consented to the issuance of this Consent Order by the Bureau under §§ 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565, without admitting or denying any of the findings of fact or conclusions of law, except that Respondent admits the facts necessary to establish the Bureau's jurisdiction over Respondent and the subject matter of this action.

## III.

## Definitions

3.    The following definitions apply to this Consent Order:

    a.    "Affected Consumers" means Rate-Lock Affected Consumers and Force-Placed Insurance Affected Consumers.

    b.    "Board" means Respondent's duly elected and acting Board of Directors.

    c.    "Effective Date" means the date on which this Consent Order is issued.

    d.    "Federal Consumer Financial Law" has the same meaning as in 12 U.S.C.

2

§ 5481(14).

e.    "Force-Placed Insurance" means collateral-protection insurance purchased by Respondent for consumers' vehicles serving as collateral for auto loans and financed by adding the cost of the collateral-protection insurance to the balances on consumers' auto loans.

f.    "Force-Placed Insurance Affected Consumers" means any consumer who was subjected to any of the Force-Placed Insurance Specified Acts and Practices during the Force-Placed Insurance Relevant Period.

g.    "Force-Placed Insurance Relevant Period" means October 15, 2005, through September 30, 2016.

h.    "Force-Placed Insurance Specified Acts and Practices" means charging borrowers for Force-Placed Insurance when Respondent knew or should have known that it had ineffective processes that were likely to result in Respondent's unnecessarily placing or maintaining Force-Placed Insurance, either for the entire term of the policy or for a portion of the term of the policy.

i.    "Non-Objection" means written notification to Respondent that the Bureau does not object to a proposal by Respondent for a course of action. With respect to any Non-Objection required by this Consent Order, the Regional Director's Non-Objection will apply only to issues or actions related to compliance with Federal Consumer Financial Law.

j.    "OCC Order" means the Consent Order issued by the Office of the Comptroller of the Currency (OCC) in the administrative adjudication styled *In the Matter of Wells Fargo Bank, N.A.*, No. AA-EC-2018-16,

issued on or about April 20, 2018.

k.    "Plans" means the Compliance Risk Management Plan required under
Paragraph 42, the Staffing Assessment and Program required under
Paragraph 44, the Internal Audit's Compliance Program required under
Paragraph 45, the Remediation Program required under Paragraphs 49–
51, the Consumer Remediation Plans defined in Paragraph 51(a), the Rate-
Lock Remediation Plan required under Paragraph 55, and the Force-
Placed Insurance Remediation Plan required under Paragraph 56.

l.    "Rate-Lock Affected Consumers" means any prospective borrower who,
during the Rate-Lock Relevant Period, was charged a fee for extending an
interest-rate-lock period for a residential-mortgage loan when the fee
should have been absorbed by Respondent under its established policy.

m.    "Rate-Lock Relevant Period" means September 16, 2013, through
February 28, 2017.

n.    "Rate-Lock Specified Acts and Practices" means charging prospective
borrowers a fee for extending an interest-rate-lock period when the fee
should have been absorbed by Respondent under its established policy and
in a manner inconsistent with how it explained the rate-lock process to
prospective borrowers.

o.    "Regional Director" means the Regional Director for the West Region for
the Office of Supervision for the Bureau of Consumer Financial Protection
or his or her delegate.

p.    "Related Consumer Action" means a private action by or on behalf of one
or more consumers or an enforcement action by another governmental

4

agency brought against Respondent based on substantially the same facts
as described in Section IV of this Consent Order.

q.  "Respondent" means Wells Fargo Bank, N.A., its subsidiaries, and its
successors and assigns.

r.  "Specified Acts and Practices" means any of the Rate-Lock Specified Acts
and Practices and Force-Placed Insurance Specified Acts and Practices, as
each is defined in this Consent Order.

## IV.

## Bureau Findings and Conclusions

The Bureau finds the following:

4.  Respondent is a national bank headquartered in Sioux Falls, South Dakota.

5.  Respondent is an insured depository institution with assets greater than $10
billion within the meaning of 12 U.S.C. § 5515(a).

6.  Respondent is the largest originator of residential-mortgage loans in the United
States. Additionally, Respondent originates, purchases, and services consumer
loans secured by automobiles. Thus, Respondent is a "covered person" as that
term is defined by the CFPA, 12 U.S.C. § 5481(6).

## A.

## Mortgage-Interest-Rate-Lock Policies and Practices

7.  During the Rate-Lock Relevant Period, it was Respondent's policy that when a
mortgage loan did not close within its initial interest-rate-lock period and the
primary cause of the delay was attributable to Respondent, if the borrower chose
to extend the interest-rate-lock period, the extension fee was to be charged to
Respondent, and not the borrower. But, in certain instances, Respondent

inappropriately charged borrowers rate-lock-extension fees that should have
been absorbed by Respondent.

8.   Respondent offers prospective borrowers the ability to "lock in" a fixed interest
     rate for a certain "rate-lock" period while their mortgage-loan application is
     pending. Rate locks allow consumers to avoid the effects of interest-rate
     fluctuations during their rate-lock period.

9.   If an interest rate is not locked, a "floating" rate that fluctuates according to
     market conditions applies, and the interest rate is set before the loan is funded.

10.  Respondent trains its loan officers to explain to prospective borrowers that if it
     appears that a loan cannot be processed and closed within the initial rate-lock
     period, then, for a fee (Extension Fee), the rate-lock-period may be extended (by,
     for example, an additional 15 or 30 days).

11.  Respondent also offers borrowers the option to pay an up-front fee that will
     extend the standard rate-lock period to 90 days (Extended Rate Lock). At the
     time of submitting an application, consumers may choose this option to protect
     against delayed closings. The up-front Extended Rate Lock option is typically less
     expensive than paying multiple Extension Fees when the loan does not close in
     time and the borrower wishes to maintain the lock.

12.  Mortgage loans may fail to close within the initial rate-lock period for many
     reasons, including delays caused by unforeseen property issues, delays in
     requesting or receiving necessary information, and delays caused by
     Respondent's internal processing.

13.  In May 2012, in response to processing delays, Respondent stopped charging any
     Extension Fees to borrowers. Instead, Respondent extended rate-lock periods

without charging borrowers a fee.

14.    In September 2013, Respondent enacted a new nationwide policy under which borrowers would pay the Extension Fee in certain circumstances.

15.    Respondent's September 2013 policy change provided that if a rate-lock extension was made necessary by borrower-caused delays, or by certain delays related to the property itself, the borrower could be charged an Extension Fee; if there were lender-caused delays, however, Respondent would extend the rate-lock period without charging borrowers a fee, as it had done since May 2012.

16.    Rate-lock choices may materially affect how much it costs consumers to get a loan. Respondent expected its loan officers to explain to prospective borrowers all of the available rate-lock options, to help borrowers select the option best suited to their needs, and to clearly explain its rate-lock process to prospective borrowers.

17.    During the Rate-Lock Relevant Period, Respondent trained its loan officers to inform prospective borrowers that they would be responsible for paying Extension Fees under circumstances where the delay was caused by the borrower or related to the property itself, including when the borrower does not timely return necessary documentation, the borrower disputes a low appraisal, previously undisclosed liens are uncovered, sellers or builders delay the process, the sale is not timely approved by a condo project or co-op board, or the borrower's credit score changes.

18.    Within days of rolling out the new policy, Respondent acknowledged in internal communications that its guidelines for its loan officers were inadequate. Respondent instructed employees that Extension Fees would be charged based

on the factor primarily responsible for the delay, without further guidance as to what that meant.

19. Almost three years after a 2013 internal audit first identified the risks for consumer harm relating to improperly assessed Extension Fees, an October 2016 internal audit found that Respondent inconsistently applied its policy and charged borrowers Extension Fees in situations where Respondent was responsible for the delay in the loan's closing.

20. Following an internal investigation and loan reviews, Respondent determined that its Extension Fee policy was not consistently applied and that, during the Rate-Lock Relevant Period, Respondent inappropriately charged certain borrowers rate-lock-extension fees that should have been absorbed by Respondent under its policy.

21. Effective March 1, 2017, Respondent substantially changed its Extension Fee practices to address the inconsistent allocation of Extension Fees.

**Unfair Acts and Practices Relating to
Interest-Rate Locks, in Violation of the CFPA**

22. An unfair act or practice is one that causes or is likely to cause substantial injury to consumers that is not reasonably avoidable and is not outweighed by countervailing benefits to consumers or competition. 12 U.S.C. § 5531(c).

23. During the Rate-Lock Relevant Period, Respondent's loan officers were instructed to explain Respondent's rate-lock process to borrowers. In fact, Respondent sometimes charged borrowers Extension Fees in situations where Respondent should have absorbed the fees.

24. Respondent's conduct caused and was likely to cause substantial injury to

8

consumers.

25.    This injury was not reasonably avoidable by consumers and was not outweighed
by any countervailing benefits to consumers or competition.

26.    Respondent engaged in unfair acts or practices during the Rate-Lock Relevant
Period, in violation of §§ 1031(c) and 1036(a)(1)(B) of the CFPA. 12 U.S.C.
§§ 5531(c), 5536(a)(1)(B).

## B.

## Force-Placed Automobile Insurance Practices

27.    Typically, when Respondent's borrowers obtained an auto-secured loan, the
borrower signed an agreement that required the borrower to maintain insurance
that would cover physical damage to the vehicle, which served as collateral for the
loan. Respondent used a vendor to monitor borrowers' insurance coverage. If a
borrower did not procure or maintain physical-damage insurance for the vehicle,
Respondent could protect its interest in the collateral by acquiring Force-Placed
Insurance on the borrower's behalf and charging the borrower for the insurance
premium paid, in whole or in part, by Respondent to the insurer, plus interest.

28.    If Respondent's vendor was unable to verify that borrowers maintained the
required insurance for their vehicles through policy information it obtained
directly from insurance companies and from other data aggregators, the vendor
was required to communicate with the borrower multiple times before Force-
Placed Insurance was acquired. Under Respondent's contract with its vendor, the
vendor was required to send written notices to the borrower, as well as attempt to
call the borrower and the borrower's previous insurance agent or insurance
carrier to request evidence of insurance. If, following this outreach, the vendor

9

was unable to obtain evidence of the required insurance, Respondent caused Force-Placed Insurance to be issued to the borrowers.

29.    Since 2005, Respondent forcibly placed insurance for the vehicles of about 2 million borrowers who secured auto loans with the bank. According to Respondent's own analyses, it forcibly placed duplicative or unnecessary insurance on hundreds of thousands of those borrowers' vehicles. In addition, for some borrowers, after appropriately placing Force-Placed Insurance policies, Respondent improperly maintained Force-Placed Insurance policies on the borrowers' accounts after the borrowers had obtained adequate insurance on their vehicles and after adequate proof of insurance had been provided. If borrowers failed to pay the amounts Respondent charged them for the Force-Placed Insurance, they faced additional fees and, in some instances, experienced delinquency, loan default, and even repossession.

30.    If the borrower provided evidence that insurance coverage had been in effect, Respondent had a process to cancel the Force-Placed Insurance and to refund premiums. But Respondent did not sufficiently monitor its vendor and internal processes, resulting in control and execution weaknesses, such as within the insurance-verification and cancellation processes and the protocols for processing refunds. Additionally, Respondent failed to provide data and information to its vendor that could have allowed its vendor to more effectively execute its obligations to Respondent and borrowers. Finally, Respondent did not maintain a process to evaluate whether fees should have been refunded and failed to appropriately address and assess customer complaints.

31.    Through quarterly reports from its vendor and its own daily reports, Respondent

was aware of high rates of Force-Placed Insurance cancellations, and Respondent
received briefings on the root causes of the cancellations. The high rates of
cancellation were also apparent within Respondent's own system of record
because it processed the refunds when a Force-Placed Insurance policy was
canceled, and it reported that refund information back to the vendor.

32.    The vendor regularly presented to Respondent's management on the Force-
Placed Insurance program's performance. These presentations included
cancellation rates of Force-Placed Insurance for borrowers who never had a lapse
in required insurance coverage, known as "flat cancels," and borrowers who had
the required insurance for part of the Force-Placed Insurance policy term, known
as "partial cancels."

33.    Respondent was informed by its vendor that, since 2005, roughly 28% of
Respondent's Force-Placed Insurance policies were canceled because they were
duplicative of insurance maintained by borrowers for the entire term of the
Force-Placed Insurance policy. The number of cancellations should have raised
concerns that Respondent's and its vendor's processes for determining insurance
coverage before and after placement of Force-Placed Insurance were insufficient.

34.    From 2011 to 2016, Respondent caused hundreds of thousands of consumers to
be charged substantial premiums—typically just over $1,000 a policy—for
unnecessary or duplicative Force-Placed Insurance. Although Respondent caused
the premiums to be refunded after receiving proof of adequate insurance during
the coverage period, the refunds covered all of the interest charged for only flat
cancels. And, in many cases, Respondent did not refund other fees or related
charges, such as repossession fees, late fees, deferral fees, and NSF fees.

35.   From 2011 to 2016, Respondent acknowledges that for at least 27,000 customers, the additional costs of the Force-Placed Insurance could have contributed to a default that resulted in the repossession of their vehicle.

### Unfair Acts and Practices Relating to
### Force-Placed Insurance, in Violation of the CFPA

36.   An unfair act or practice is one that causes or is likely to cause substantial injury to consumers that is not reasonably avoidable and is not outweighed by countervailing benefits to consumers or competition. 12 U.S.C. § 5531(c).

37.   Respondent's conduct caused or was likely to cause substantial injuries to consumers because it required them to pay for Force-Placed Insurance premiums and interest that they should not have owed, to incur fees, and, in some instances, to be subject to defaults on their auto loans and repossession of their vehicles.

38.   These injuries were not reasonably avoidable by consumers and were not outweighed by countervailing benefits to consumers or to competition.

39.   From July 21, 2011, through September 30, 2016, Respondent engaged in unfair acts or practices, in violation of §§ 1031(c) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(c), 5536(a)(1)(B).

### ORDER

### V.

### Conduct Provisions

**IT IS ORDERED**, under §§ 1053 and 1055 of the CFPA, that:

40.   Respondent and its officers, agents, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, may not engage in any Specified Acts and Practices.

# VI.

## Compliance Committee

**IT IS FURTHER ORDERED** that:

41. As set forth in Article II, ¶ 1, of the OCC Order, the Board shall appoint and maintain an active Compliance Committee of at least 3 members, of which a majority shall be directors who are not employees or officers of Respondent or any of its subsidiaries or affiliates. The Compliance Committee shall be responsible for monitoring and overseeing Respondent's compliance with the provisions of this Consent Order. The Compliance Committee shall meet quarterly and maintain minutes of its meetings at which compliance with this Consent Order is discussed.

# VII.

## Compliance Risk Management and Internal Audit

**IT IS FURTHER ORDERED** that:

42. Consistent with the requirements of Article IV, ¶ 1, of the OCC Order, within 60 days of the Effective Date, Respondent must submit to the Regional Director for review and determination of Non-Objection an acceptable enterprise-wide Compliance Risk Management Plan (Compliance Risk Management Plan) containing a complete description of the actions that are necessary and appropriate to achieve compliance with Article IV of the OCC Order. The Compliance Risk Management Plan should also be designed to ensure that Respondent's acts and practices comply with Federal Consumer Financial Law and the terms of this Consent Order. In addition to the requirements set forth in Article IV, ¶ 2, of the OCC Order, the Compliance Risk Management Plan must be

13

commensurate with the size, complexity, and risks of Respondent's operations and include, at a minimum:

a.   detailed steps to develop, implement, and maintain policies and procedures that ensure oversight and commitment to an effective compliance management system;

b.   detailed steps to develop, implement, and maintain policies and procedures that are designed to ensure comprehension, identification, and management of consumer-related risks arising from Respondent's products, services, and activities;

c.   detailed steps to develop, implement, and maintain policies and procedures that are designed to ensure self-identification and timely self-reporting to the Bureau of violations and potential violations of Federal Consumer Financial Law as Respondent identifies such issues and develop an appropriate Consumer Remediation Plan, as defined in Paragraph 51(a);

d.   detailed steps to develop, implement, and maintain policies and procedures designed to ensure effective third-party vendor oversight;

e.   detailed steps to develop, implement, and maintain policies and procedures designed to ensure Respondent's consumer complaint resolution process is responsive and effective;

f.   detailed steps to develop, implement, and maintain policies, procedures, and other applicable employee guidance to address the acts and practices that are the subject of this Consent Order;

g.   detailed steps to develop, implement, and maintain employee training to

14

address the acts and practices that are the subject of this Consent Order;

h.      detailed steps to develop, implement, and maintain monitoring, testing, and other compliance oversight controls to address the acts and practices that are the subject of this Consent Order; and

i.      specific timeframes and deadlines for implementation of the steps described above or discussed in the Compliance Risk Management Plan, consistent with the deadlines set forth in this Consent Order.

43.    After receiving notice that the Regional Director has made a determination of Non-Objection to the Compliance Risk Management Plan, Respondent must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the Compliance Risk Management Plan.

44.    Consistent with the requirements of Article V, ¶ 1, of the OCC Order, within 60 days of the Effective Date, Respondent must submit to the Regional Director for review and determination of Non-Objection a Staffing Assessment and Program (Staffing Assessment) for Respondent's Compliance Risk Management Program that will provide for the allocation of adequate resources. At a minimum, the Staffing Assessment must satisfy the requirements set forth in Article V, ¶ 1, of the OCC Order. As required by Article V, ¶¶ 2–3, of the OCC Order, the Compliance Committee must ensure that management corrects any deficiencies identified by the Staffing Assessment and implements any plans or recommendations resulting from the Staffing Assessment. Thereafter, the Compliance Committee must ensure that Respondent, at a minimum, annually evaluates the skills and expertise of the independent Compliance Risk Management Program's staff to determine if there are any material deficiencies

in skills or expertise and develop a plan to address any identified gaps or deficiencies.

45. Consistent with the requirements of Article VI, ¶ 1, of the OCC Order, within 60 days of the Effective Date, Respondent must submit to the Regional Director for review and determination of Non-Objection a plan to enhance Internal Audit's program with respect to compliance (Internal Audit's Compliance Program). The Regional Director's Non-Objection will apply only to issues or actions related to compliance with Federal Consumer Financial Law. In addition to the requirements set forth in Article VI, ¶ 1, the Internal Audit's Compliance Program must, at a minimum, provide for a compliance audit of Respondent's acts and practices related to the Specified Acts and Practices to ensure compliance with Federal Consumer Financial Law and the terms of this Consent Order.

## VIII.

## Role of the Board

**IT IS FURTHER ORDERED** that:

46. The Board (or a Committee of the Board, which may include the Compliance Committee) must review all submissions (including plans, reports, programs, policies, and procedures) required by this Consent Order before submission to the Bureau.

47. Although this Consent Order requires Respondent to submit certain documents for the review or determination of Non-Objection by the Regional Director, the Board will have the ultimate responsibility for proper and sound management of Respondent and for ensuring that Respondent complies with Federal Consumer Financial Law and this Consent Order, including successful execution of the

Plans. The Board shall ensure that Respondent has processes, personnel, and control systems to ensure implementation of and adherence to the plans, programs, policies, and procedures required by this Consent Order.

48.    In each instance that this Consent Order requires the Board to ensure adherence to, or perform certain obligations of Respondent, the Board must:

    a.    authorize whatever actions are necessary for Respondent to fully comply with the Consent Order;

    b.    require timely reporting by management to the Board on the status of compliance obligations and actions directed by the Board to be taken under this Consent Order;

    c.    follow up on non-compliance with such actions in a timely and appropriate manner; and

    d.    require timely and appropriate corrective action to remedy any material non-compliance with any failures to comply with Board directives related to this section.

## IX.

## Remediation Program and Order to Pay Redress

**IT IS FURTHER ORDERED** that:

49.    Consistent with the requirements of Article VII, ¶ 1, of the OCC Order, within 120 days of the Effective Date, Respondent must submit to the Regional Director for review and determination of Non-Objection a comprehensive written plan to develop and implement a program for remediation activities conducted by Respondent (Remediation Program). The Regional Director's Non-Objection will apply only to issues or actions related to compliance with Federal Consumer

Financial Law.

50. After receiving notification that the Regional Director has made a determination of Non-Objection to the Remediation Program, Respondent must implement and adhere to the definitions, steps, recommendations, deadlines, and timeframes outlined in the Remediation Program.

51. In addition to the requirements set forth in Article VII, ¶ 2, of the OCC Order, the Remediation Program must include, at a minimum:

   a.   a requirement for the development of remediation plans (Consumer Remediation Plans) for consumers that Respondent identifies as incurring an economic or other cognizable harm based on (1) a violation of Federal Consumer Financial Law or (2) a potential violation that Respondent elects to include in the Remediation Program; Respondent's development of a Consumer Remediation Plan will not be deemed an admission that a violation has occurred;

   b.   a definition of Consumer Remediation Plans that may include minimum thresholds for the number of customers affected, amounts involved, or other factors before remediation of a violation or potential violation of Federal Consumer Financial Law is deemed to be a Consumer Remediation Plan subject to the processes set forth in this paragraph; with respect to litigated settlements, Respondent will independently evaluate whether a Consumer Remediation Plan is required;

   c.   policies and procedures for conducting a root-cause analysis of any violations of Federal Consumer Financial Law identified by Respondent or any acts or practices for which Respondent has developed a Consumer

Remediation Plan;

d.     policies and procedures for analyzing: (1) the severity of any economic or other cognizable harm to consumers resulting from any violations of Federal Consumer Financial Law or any acts or practices for which Respondent has developed a Consumer Remediation Plan; (2) the duration of time over which the violations of Federal Consumer Financial Law occurred or any acts or practices for which Respondent has developed a Consumer Remediation Plan; and (3) the pervasiveness of the violations of Federal Consumer Financial Law or any acts or practices for which Respondent has developed a Consumer Remediation Plan;

e.     no conditioning of the payment of any redress to any consumer on that consumer's waiving any right, except that the Remediation Program may include procedures and standards for waivers in litigated settlements, settlements involving parties represented by counsel, settlements with any other governmental regulatory or enforcement agency, or in other circumstances acceptable to the Regional Director; and

f.     reporting procedures for the monthly reporting of any anticipated or ongoing Consumer Remediation Plans developed by Respondent (Remediation Reports) that, at a minimum: (1) meet the requirements set forth in Article VII, ¶ 2(d); (2) identify the type and amount of consumer remediation and other relief provided to consumers; and (3) provide for the provision of each Remediation Report to the Compliance Committee and Regional Director within 10 days of its completion.

52.     Consistent with Article VIII, ¶ 1, of the OCC Order, in connection with any

Consumer Remediation Plan that has been submitted to the Regional Director under Paragraphs 53, 55, or 56 and has received Non-Objection from the Regional Director, an independent unit, third party, or Internal Audit, shall prepare a report validating that Respondent's implementation of the Consumer Remediation Plan complies with the requirements of Respondent's Remediation Program (Remediation Review Report). Upon notification in writing by the Regional Director, the Bureau may require Respondent to engage an independent third party to validate that Respondent's implementation of a Consumer Remediation Plan complies with the requirements of Respondent's Remediation Program, and prepare a Remediation Review Report. Each Remediation Review Report should meet the requirements set forth in Article VIII, ¶ 2. Within 10 days of its completion, each Remediation Review Report shall be submitted to the Compliance Committee and the Regional Director.

53. Consistent with Article VIII, ¶ 4, of the OCC Order, the Regional Director may require submission for a determination of Non-Objection a validated Consumer Remediation Plan (as defined in Paragraph 51(a)) that meets the following criteria:

    a.    the number of customers or customer accounts likely to require remediation exceeds 50,000; or

    b.    the anticipated amount of the total remediation to be paid, refunded, or remitted to customers exceeds $10 million.

54. Consistent with Article VIII, ¶ 5, of the OCC Order, Respondent, at least 30 days (or as soon as practicable per the terms of the controlling legal document) before the implementation of any Consumer Remediation Plan pursuant to a legal

judgment, court order, or negotiated settlement of any legal proceeding as
specified in the Remediation Program that relates to a violation or a potential
violation of Federal Consumer Financial Law must provide the Regional Director
the proposed Consumer Remediation Plan.

55.   Consistent with the requirements of Article VIII, ¶ 6, of the OCC Order, within 60
days of the Effective Date, Respondent must submit to the Regional Director for
review and determination of Non-Objection a comprehensive remediation plan to
address the findings set forth in this Consent Order with respect to Rate-Lock
Specified Acts and Practices and to provide redress to all persons who paid rate-
lock-extension fees and who claim to be Rate-Lock Affected Consumers (Rate-
Lock Remediation Plan). The Rate-Lock Remediation Plan must, at a minimum:

   a.   provide for completion of such remediation, including internal audit
        validation, within 180 days of the Regional Director's Non-Objection; and

   b.   not condition the payment of any redress on the claimant's waiving any
        right.

56.   Consistent with the requirements of Article VIII, ¶ 6, of the OCC Order, within 60
days of the Effective Date, Respondent must submit to the Regional Director for
review and determination of Non-Objection a comprehensive remediation plan to
address the findings set forth in this Consent Order with respect to Force-Placed
Insurance Specified Acts and Practices and to provide redress to Force-Placed
Insurance Affected Consumers (Force-Placed Insurance Remediation Plan). The
Force-Placed Insurance Remediation Plan must, at a minimum:

   a.   identify all Force-Placed Insurance Affected Consumers, as well as the
        types and amounts of economic or other cognizable harm suffered by

Force-Placed Insurance Affected Consumers as a result of the Force-Placed Insurance Specified Acts and Practices, and state the means by which Force-Placed Insurance Affected Consumers have been identified;

b.     describe the methodology for effectively identifying Force-Placed Insurance Affected Consumers;

c.     describe the methodology for determining the appropriate type of redress for economic or other cognizable harm caused by the Force-Placed Insurance Specified Acts and Practices;

d.     describe the process for providing redress to Force-Placed Affected Consumers and identifying the dollar amount of redress for each category of Affected Consumers;

e.     describe procedures by which Respondent will notify Force-Placed Insurance Affected Consumers who were subject to any of the Force-Placed Insurance Specified Acts and Practices described in Paragraph 3(h) of this Consent Order, including the form of the notification such consumers will receive;

f.     describe how Respondent will locate Force-Placed Insurance Affected Consumers for the provision of all forms of redress, the steps Respondent will take with respect to Force-Placed Insurance Affected Consumers whose mail has been returned to Respondent as undeliverable, including the reasonable steps to obtain a current address using standard address-search methodologies, and the steps Respondent will take with respect to redress payments that are not cashed after a reasonable period of time;

g.     provide the form of the letter or notice and the envelope that will be sent

to such Force-Placed Insurance Affected Consumers notifying them of the redress;

h.    provide for completion of such remediation, including internal audit validation, within 180 days of the Regional Director's Non-Objection; and

i.    not condition the payment of any redress to any Force-Placed Insurance Affected Consumers under this Consent Order on Force-Placed Insurance Affected Consumers' waiving any right.

57.    In the interest of expediting relief to affected consumers, Respondent may proceed with providing remediation to consumers under any Consumer Remediation Plan, whether or not it has been submitted for, or received, a determination of Non-Objection. The Bureau, before providing Non-Objection for any Consumer Remediation Plan, may require Respondent to provide additional remediation to consumers and to remediate other consumers, consistent with requirements of Federal Consumer Financial Law.

58.    Respondent shall not be considered to be in compliance with Paragraphs 52–57, and Paragraphs 52–57 remain effective, until such time that the Regional Director has determined that Respondent has complied with Section XII and Paragraphs 41–51.

## X.

## Order to Pay Civil Money Penalty

**IT IS FURTHER ORDERED** that:

59.    Under § 1055(c) of the CFPA, 12 U.S.C. § 5565(c), by reason of the violations of law described in Section IV of this Consent Order, and taking into account the factors in 12 U.S.C. § 5565(c)(3), Respondent must pay a civil money penalty of

$1 billion to the Bureau. Under 12 U.S.C. § 5565(c)(4), the amount Respondent must pay will be remitted by $500 million upon Respondent's satisfaction of its obligation to pay that amount in penalties to the OCC for related conduct.

60.  Within 10 days of the Effective Date, Respondent must pay the civil money penalty by wire transfer to the Bureau or to the Bureau's agent in compliance with the Bureau's wiring instructions.

61.  The civil money penalty will be deposited in the Civil Penalty Fund of the Bureau as required by § 1017(d) of the CFPA, 12 U.S.C. § 5497(d).

62.  Respondent must treat the civil money penalty as a penalty paid to the government for all purposes. Regardless of how the Bureau ultimately uses those funds, Respondent may not:

   a.  claim, assert, or apply for a tax deduction, tax credit, or any other tax benefit for any civil money penalty paid under this Consent Order; or

   b.  seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment made under any insurance policy, with regard to any civil money penalty paid under this Consent Order.

63.  To preserve the deterrent effect of the civil money penalty in any Related Consumer Action, Respondent may not argue that Respondent is entitled to, nor may Respondent benefit from, any offset or reduction of any compensatory monetary remedies imposed in the Related Consumer Action because of the civil money penalty paid in this action or because of any payment that the Bureau makes from the Civil Penalty Fund (Penalty Offset). If the court in any Related Consumer Action grants such a Penalty Offset, Respondent must, within 30 days

24

of entry of a final order granting the Penalty Offset, notify the Bureau and pay the amount of the Penalty Offset to the U.S. Treasury. Such a payment will not be considered an additional civil money penalty and will not change the amount of the civil money penalty imposed in this action.

## XI.

### Additional Monetary Provisions

**IT IS FURTHER ORDERED** that:

64.   In the event of any default on Respondent's obligations to make payment under this Consent Order, interest, computed under 28 U.S.C. § 1961, as amended, will accrue on any outstanding amounts not paid from the date of default to the date of payment and will immediately become due and payable.

65.   Respondent must relinquish all dominion, control, and title to the funds paid to the fullest extent permitted by law, and no part of the funds may be returned to Respondent.

66.   Under 31 U.S.C. § 7701, Respondent, unless it already has done so, must furnish to the Bureau its taxpayer-identifying numbers, which may be used for purposes of collecting and reporting on any delinquent amount arising out of this Consent Order.

67.   Within 30 days of the entry of a final judgment, consent order, or settlement in a Related Consumer Action, Respondent must notify the Regional Director of the final judgment, consent order, or settlement in writing. That notification must indicate the amount of redress, if any, that Respondent paid or is required to pay to consumers and describe the consumers or classes of consumers to whom that redress has been or will be paid.

# XII.

## Reporting Requirements

**IT IS FURTHER ORDERED** that:

68.    Respondent must notify the Bureau of any development that may affect
compliance obligations arising under this Consent Order, including but not
limited to a dissolution, assignment, sale, merger, or other action that would
result in the emergence of a successor company; the creation or dissolution of a
subsidiary, parent, or affiliate that engages in any acts or practices subject to this
Consent Order; the filing of any bankruptcy or insolvency proceeding by or
against Respondent; or a change in Respondent's name or address. Respondent
must provide this notice, if practicable, at least 30 days before the development,
but in any case no later than 14 days of the development.

69.    Within 120 days of the Effective Date, and thereafter within 45 days of the end of
each calendar quarter, the Compliance Committee shall submit a written
progress report (Compliance Report) to the Board that, at a minimum:

   a.    lists each applicable paragraph and subparagraph of the Consent Order
   and describes in detail the manner and form in which Respondent has
   complied with each such paragraph and subparagraph of the Consent
   Order and the results and status of those actions;

   b.    describes in detail the manner and form in which Respondent has
   complied with the Plans; and

   c.    attaches a copy of each Order Acknowledgment obtained under Section
   XIII, unless previously submitted to the Bureau.

70.  The Board shall approve and forward a copy of the Compliance Report, with any additional comments by the Board, to the Regional Director within 15 days of the first Board meeting following receipt of such report, unless additional time is granted by the Regional Director through a determination of Non-Objection.

71.  Consistent with the requirements of Article III, ¶ 5, of the OCC Order, within 120 days of receipt of the Regional Director's determination of Non-Objection to the Plans, Respondent's Internal Audit department shall complete an assessment of Respondent's progress toward implementing the Plans (other than Consumer Remediation Plans, as defined in Paragraph 51(a)). In addition, upon the Regional Director's written request, Respondent's Internal Audit will complete the same such assessment within 45 days of the end of every calendar quarter thereafter until the completion of the Plans. The findings shall be memorialized in writing and, within 30 days of completing the assessment, Internal Audit shall provide its written findings to the Compliance Committee and the Regional Director. Upon notification in writing by the Regional Director, the Bureau may require Respondent to engage an independent third party to reassess Respondent's progress toward implementing the Plans (other than Consumer Remediation Plans, as defined in Paragraph 51(a)). The independent third party's findings must be memorialized in writing and, within 30 days of completing the assessment, the independent third party must provide its written findings to the Compliance Committee and the Regional Director.

# XIII.

## Order Distribution and Acknowledgment

**IT IS FURTHER ORDERED** that:

72.  Within 7 days of the Effective Date, Respondent must submit to the Regional Director an acknowledgment of receipt of this Consent Order, sworn under penalty of perjury.

73.  Within 60 days of the Effective Date, Respondent must deliver a copy of this Consent Order to each of its board members and executive officers, as well as to any managers, employees, or other agents and representatives who have responsibilities related to the subject matter of this Consent Order.

74.  Respondent must deliver a copy of this Consent Order and accompanying Compliance and Redress plans to any business entity resulting from any change in structure referred to in Section XII, any future board members and executive officers, as well as to any managers, employees, or other agents and representatives who will have responsibilities related to the subject matter of the Consent Order before they assume their responsibilities.

75.  Respondent must secure a signed and dated statement acknowledging receipt of a copy of this Consent Order, ensuring that any electronic signatures comply with the requirements of the E-Sign Act, 15 U.S.C. §§ 7001–7006, within 30 days of delivery, from all persons receiving a copy of this Consent Order under this section.

# XIV.

## Recordkeeping

**IT IS FURTHER ORDERED** that:

76. Respondent must create, or if already created, must retain for the duration of this Consent Order, the following business records:

    a.    all documents and records necessary to demonstrate full compliance with each provision of this Consent Order, including all submissions to the Bureau;

    b.    all documents and records pertaining to the Plans required in this Consent Order; and

    c.    to the extent they are relevant to this Consent Order, copies of all sales scripts, training materials, advertisements, websites, and other marketing materials, including any such materials used by a third party on behalf of Respondent.

77. Respondent must retain the documents identified in Paragraph 76 for the duration of the Consent Order.

78. Respondent must make the documents identified in Paragraph 76 available to the Bureau upon the Bureau's request.

# XV.

## Notices

**IT IS FURTHER ORDERED** that:

79. Unless otherwise directed in writing by the Bureau, Respondent must provide all submissions, requests, communications, or other documents relating to this Consent Order in writing, with the subject line, "In re Wells Fargo Bank, N.A.,

File No. 2018-BCFP-0001," and send them by overnight courier or first-class mail

to the below addresses and contemporaneously by email to

Enforcement_Compliance@cfpb.gov:

> Regional Director
> Bureau of Consumer Financial Protection
> West Region
> 301 Howard Street, Suite 1200
> San Francisco, CA 94105
>
> Assistant Director for Enforcement
> Bureau of Consumer Financial Protection
> ATTENTION: Office of Enforcement
> 1700 G Street, NW
> Washington DC 20552.

## XVI.

## Cooperation with the Bureau

**IT IS FURTHER ORDERED** that:

80.    Respondent must cooperate fully to help the Bureau determine the identity and

location of, and the amount of injury sustained by, each Affected Consumer.

Respondent must provide such information in its or its agents' possession or

control within 14 days of receiving a written request from the Bureau.

81.    Respondent must cooperate fully with the Bureau in this matter and in any

investigation related to or associated with the conduct described in Section IV.

Respondent must provide truthful and complete information, evidence, and

testimony. Respondent must cause Respondent's officers, employees,

representatives, and agents to appear for interviews, discovery, hearings, trials,

and any other proceedings that the Bureau may reasonably request upon 10 days'

written notice, or other reasonable notice, at such places and times as the Bureau

may designate, without the service of compulsory process.

# XVII.

## Compliance Monitoring

**IT IS FURTHER ORDERED** that:

82.  Within 14 days of receipt of a written request from the Bureau, Respondent must submit additional Compliance Reports or other requested information, which must be made under penalty of perjury; provide sworn testimony; or produce documents.

83.  Respondent must permit Bureau representatives to interview any employee or other person affiliated with Respondent who has agreed to such an interview. The person interviewed may have counsel present.

84.  Nothing in this Consent Order will limit the Bureau's lawful use of civil investigative demands under 12 C.F.R. § 1080.6 or other compulsory process.

# XVIII.

## Modifications to Non-Material Requirements

**IT IS FURTHER ORDERED** that:

85.  Respondent may seek a modification to non-material requirements of this Consent Order (*e.g.*, reasonable extensions of time and changes to reporting requirements) by submitting a written request to the Regional Director.

86.  The Regional Director may, in his or her discretion, modify any non-material requirements of this Consent Order (*e.g.*, reasonable extensions of time and changes to reporting requirements) if he or she determines that good cause justifies the modification. Any such modification by the Regional Director must be in writing.

# XIX.

## Administrative and Other Provisions

87.    With respect to any determination of Non-Objection required in this Consent Order, if the Regional Director objects to any proposed, or lack of proposed, action by Respondent, the Regional Director shall direct Respondent to make such revisions, and Respondent shall make the revisions and resubmit the proposed action within 14 days. Upon notification to Respondent of any determination of Non-Objection required by this Consent Order, Respondent must implement the course of action within 30 days unless otherwise specified, and the Board shall ensure that Respondent executes and thereafter adheres to the course of action. During the term of this Consent Order, Respondent shall revise the required plans, programs, policies, and procedures as necessary to incorporate new, or changes to, applicable legal requirements and supervisory guidelines. Respondent cannot make any changes to the course of action without obtaining a determination of Non-Objection from the Regional Director.

88.    The Plans required under this Consent Order must contain a complete description of the actions necessary to achieve compliance with their stated requirements in this Consent Order and the components of each Plan shall be completed within the timeframes set forth in this Consent Order.

89.    The provisions of this Consent Order do not bar, estop, or otherwise prevent the Bureau, or any other governmental agency, from taking any other action against Respondent, except as described in Paragraph 90.

90.    The Bureau releases and discharges Respondent from all potential liability for law violations that the Bureau has or might have asserted based on the acts and

practices described in Section IV of this Consent Order, to the extent such acts and practices occurred before the Effective Date and the Bureau knows about them as of the Effective Date. The Bureau expressly reserves its right to take future supervisory and enforcement actions, in it is discretion and as appropriate, and to assess a civil money penalty (bound by statutory maximum penalty amounts) in the future based on other violations of law and practices even though they may be addressed by required remedial actions in this Consent Order. The Bureau may use the practices described in this Consent Order in future enforcement actions against Respondent and its affiliates, including, without limitation, to establish a pattern or practice of violations or the continuation of a pattern or practice of violations or to calculate the amount of any penalty. This release does not preclude or affect any right of the Bureau to determine and ensure compliance with the Consent Order or to seek penalties for any violations of the Consent Order.

91.    This Consent Order is intended to be, and will be construed as, a final Consent Order issued under § 1053 of the CFPA, 12 U.S.C. § 5563, and expressly does not form, and may not be construed to form, a contract binding the Bureau or the United States.

92.    The Consent Order will remain effective and enforceable, except to the extent that any provisions of this Consent Order have been amended, suspended, waived, or terminated in writing by the Bureau or its designated agent.

93.    Calculation of time limitations will run from the Effective Date and be based on calendar days, unless otherwise noted.

94.    Should Respondent seek to transfer or assign all or part of its operations that are

subject to this Consent Order, Respondent must, as a condition of sale, obtain the written agreement of the transferee or assignee to comply with all applicable provisions of this Consent Order.

95.   The provisions of this Consent Order will be enforceable by the Bureau. For any violation of this Consent Order, the Bureau may impose the maximum amount of civil money penalties allowed under § 1055(c) of the CFPA, 12 U.S.C. § 5565(c). In connection with any attempt by the Bureau to enforce this Consent Order in federal district court, the Bureau may serve Respondent wherever Respondent may be found, and Respondent may not contest that court's personal jurisdiction over Respondent.

96.   This Consent Order and the accompanying Stipulation contain the complete agreement between the parties. The parties have made no promises, representations, or warranties other than what is contained in this Consent Order and the accompanying Stipulation. This Consent Order and the accompanying Stipulation supersede any prior oral or written communications, discussions, or understandings.

97.   Nothing in this Consent Order or the accompanying Stipulation may be construed as allowing Respondent, its Board, officers, or employees to violate any law, rule, or regulation.

98.   Except as expressly stated herein, to the extent that a specific action by

Respondent is required both by this Consent Order and by the OCC Order, action

by Respondent that satisfies a requirement of the OCC Order will satisfy that

same requirement under this Consent Order.

**IT IS SO ORDERED**, this 20th day of April, 2018.

_____
Mick Mulvaney, Acting Director
Bureau of Consumer Financial Protection

35

# Exhibit D

**#2018-026**

**UNITED STATES OF AMERICA
DEPARTMENT OF THE TREASURY
COMPTROLLER OF THE CURRENCY**

|  |  |  |
|---|---|---|
| **In the Matter of:** | ) | |
| | ) | |
| Wells Fargo Bank, N.A. | ) | AA-EC-2018-16 |
| Sioux Falls, South Dakota | ) | |
| | ) | |

## CONSENT ORDER FOR A CIVIL MONEY PENALTY

The Comptroller of the Currency of the United States of America ("Comptroller"),

through his national bank examiners and other staff of the Office of the Comptroller of the

Currency ("OCC"), has conducted examinations of Wells Fargo Bank, N.A., Sioux Falls, South

Dakota ("Bank"). The OCC has identified deficiencies in the Bank's enterprise-wide

compliance risk management program that constituted reckless unsafe or unsound practices and

resulted in violations of the unfair acts or practices provision of Section 5 of the Federal Trade

Commission Act, 15 U.S.C. § 45(a)(1). The OCC has informed the Bank of the findings

resulting from the examinations.

The Bank, by and through its duly elected and acting Board of Directors ("Board"), has

executed a Stipulation and Consent to the Issuance of an Order for a Civil Money Penalty, dated

April 20, 2018, that is accepted by the Comptroller ("Stipulation"). By this Stipulation, which is

incorporated herein by reference, the Bank has consented to the issuance of this Consent Order

for a Civil Money Penalty ("Order") by the Comptroller.

# ARTICLE I

## COMPTROLLER'S FINDINGS

The Comptroller finds, and the Bank neither admits nor denies, the following:

(1)     Since at least 2011, the Bank has failed to implement and maintain a compliance risk management program commensurate with the Bank's size, complexity and risk profile. The Bank's failure to implement and maintain a satisfactory compliance risk management program has caused the Bank to engage in reckless unsafe or unsound practices and violations of law.

(2)     In the course of its ongoing supervision of the Bank, the OCC has identified the following deficiencies and reckless unsafe or unsound practices with respect to the Bank's compliance risk management program:

(a)     Failure to establish effective first and second lines of defense as required by 12 C.F.R. Part 30, Appendix D and insufficient compliance audit;

(b)     Inability to execute on a comprehensive plan to address compliance risk management deficiencies;

(c)     Failure to fill mission-critical staffing positions for Wells Fargo Compliance, formerly known as the Regulatory Compliance Risk Management unit, with individuals who possess the requisite knowledge, skills, and abilities to perform assigned duties;

(d)     Failure to implement a reliable compliance risk assessment and testing program;

(e)     Inadequate reporting to the Board regarding compliance concerns, the regulatory landscape, and the Bank's efforts to correct its compliance problems and address regulatory changes; and

2

(f)    Failure to adequately develop and implement key elements of its compliance risk management program designed to ensure that the Bank addressed risks related to potential unfair or deceptive acts or practices since 2014.

(3)    With respect to its enterprise-wide compliance risk management program, the Bank has previously identified and reported to the OCC certain of the deficiencies that are described in this Order. The Bank has begun corrective action, and has committed to taking all necessary and appropriate steps to remedy the deficiencies identified by the OCC and to establish an effective compliance risk management program.

(4)    In addition to the reckless unsafe or unsound compliance risk management practices outlined in Paragraph (2) above, prior to June 2012, and continuing through October 2016, the Bank's Dealer Services unit, and its vendor, caused the improper placement and/or maintenance of collateral protection insurance ("CPI") policies on automobile loan accounts, and charged premiums, interest, and other fees on borrowers' accounts where the borrowers had demonstrated adequate insurance under the terms of their automobile loan note/contract. The Bank, after appropriately placing CPI policies on some borrowers' accounts, improperly maintained CPI policies on borrowers' accounts after the borrowers had demonstrated that they had obtained adequate insurance on their vehicles.

(5)    As a result of the Bank's improper CPI placement practices, borrowers were improperly charged CPI premiums, interest, and fees, and suffered loan delinquencies due to increased loan payment amounts. In some cases, the Bank improperly repossessed vehicles from borrowers who had defaulted on their loans due to improperly placed or maintained CPI policies.

(6)    The Bank's aforementioned practices with respect to CPI constituted unfair acts or practices in or affecting commerce in violation of the unfair acts or practices provision of

3

Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), and were unsafe or unsound.

(7)     Beginning in at least September 2013 and continuing through March 2017, it was the Bank's policy that if (a) a mortgage loan application did not close within its initial interest rate lock period in circumstances where the Bank was responsible for the failure of the loan to close and (b) the customer chose to extend the interest rate lock period, the extension fee was to be charged to the Bank, and not the customer. However, in a number of instances, the Bank charged customers mortgage interest rate lock extension fees even though the Bank had caused the loan closing to fail to occur within the mortgage interest rate lock period.

(8)     As a result of the Bank's mortgage interest rate lock extension fee practices, customers were improperly charged mortgage interest rate extension fees when the Bank should have borne those costs. The Bank's mortgage interest rate lock extension fee practices constituted unfair acts or practices in or affecting commerce in violation of the unfair acts or practices provision of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), and were unsafe or unsound.

(9)     By reason of the foregoing conduct, the Bank engaged in reckless unsafe or unsound practices and violations of law that were part of a pattern of misconduct, and was unjustly enriched.

Pursuant to the authority vested in him by the Federal Deposit Insurance Act, as amended, 12 U.S.C. § 1818, the Comptroller hereby ORDERS that:

4

**ARTICLE II**

**ORDER FOR A CIVIL MONEY PENALTY**

Pursuant to the authority vested in him by the Federal Deposit Insurance Act,

12 U.S.C. § 1818(i), the Comptroller orders, and the Bank consents to the following:

(1)    The Bank shall make payment of a civil money penalty in the total amount of

$500,000,000, which shall be paid upon the execution of this Order:

>    (a)    If a check is the selected method of payment, the check shall be made
>
>    payable to the Treasurer of the United States and shall be delivered to:
>
>    Comptroller of the Currency, P.O. Box 979012, St. Louis, Missouri 63197-9000.
>
>    (b)    If a wire transfer is the selected method of payment, it shall be sent in
>
>    accordance with instructions provided by the Comptroller.
>
>    (c)    The docket number of this case (AA-EC-2018-16) shall be entered on the
>
>    payment document or wire confirmation and a photocopy of the payment
>
>    document or confirmation of the wire transfer shall be sent immediately, by
>
>    overnight delivery, to the Director of Enforcement and Compliance, Office of the
>
>    Comptroller of the Currency, 400 7th Street, S.W., Washington, D.C. 20219.

(2)    This Order shall be enforceable to the same extent and in the same manner as an

effective and outstanding order that has been issued and has become final pursuant to

12 U.S.C. § 1818(h) and (i).

## ARTICLE III

## OTHER PROVISIONS

(1)     This Order is intended to be, and shall be construed to be, a final order issued

pursuant to 12 U.S.C. § 1818(i)(2), and expressly does not form, and may not be construed to

form, a contract binding on the Comptroller or the United States.

(2)     This Order constitutes a settlement of the civil money penalty proceeding against

the Bank contemplated by the Comptroller, based on the practices and violations of law

described in the Comptroller's Findings set forth in Article I of this Order. The Comptroller

releases and discharges the Bank from all potential liability for a civil money penalty that has

been or might have been asserted by the Comptroller based on the practices and violations

described in Article I of this Order, to the extent known to the Comptroller as of the effective

date of this Order. Notwithstanding this release, the OCC expects the Bank to expeditiously

undertake all necessary and appropriate actions to achieve compliance with the Consent Order

issued by the OCC pursuant to 12 U.S.C. § 1818(b) (OCC Order AA-EC-2018-15), and to avoid

future violations of law and harm to consumers. The OCC expressly reserves its right to assess

future civil money penalties, or take other supervisory and/or enforcement actions, including in

circumstances where the OCC determines that the Bank is not making sufficient and sustainable

progress towards implementation of an effective and sustainable enterprise-wide compliance risk

management program. Such actions could include issuing a cease and desist order pursuant to

12 U.S.C. § 1818(b)(6) that imposes business restrictions and/or requires the Bank to make

changes to its senior executive officers or any and/or all members of the Board. Moreover,

nothing in this Order shall prevent the Comptroller from:

6

(a)    Instituting enforcement actions, other than a civil money penalty, against the Bank based on the findings set forth in Article I of this Order;

(b)    Instituting enforcement actions against the Bank based on any other findings;

(c)    Instituting enforcement actions against the Bank's institution-affiliated parties based on the findings set forth in Article I of this Order, or any other findings; or

(d)    Utilizing the findings set forth in Article I of this Order in future enforcement actions against the Bank or its institution-affiliated parties to establish a pattern or the continuation of a pattern.

Further, nothing in this Order shall affect any right of the Comptroller to determine and ensure compliance with the terms and provisions of this Order.

(3)    The terms of this Order, including this paragraph, are not subject to amendment or modification by any extraneous expression, prior agreements, or prior arrangements between the parties, whether oral or written.

**IT IS SO ORDERED**, this 20th day of April, 2018.


/s/Greg J. Coleman
Greg J. Coleman
Deputy Comptroller
Large Bank Supervision

8

**UNITED STATES OF AMERICA
DEPARTMENT OF THE TREASURY
COMPTROLLER OF THE CURRENCY**

| | | |
|---|---|---|
| **In the Matter of:** | ) | |
| | ) | |
| | ) | |
| Wells Fargo Bank, N.A. | ) | AA-EC-2018-16 |
| Sioux Falls, South Dakota | ) | |
| | ) | |

**STIPULATION AND CONSENT TO THE ISSUANCE
OF AN ORDER FOR A CIVIL MONEY PENALTY**

**WHEREAS**, the Comptroller of the Currency of the United States of America ("Comptroller"), based upon information derived from the exercise of his regulatory and supervisory responsibilities, intends to initiate a civil money penalty proceeding against Wells Fargo Bank, N.A., Sioux Falls, South Dakota ("Bank"), pursuant to 12 U.S.C. § 1818(i), for deficiencies in the Bank's enterprise-wide compliance risk management program that constituted reckless unsafe or unsound practices and resulted in violations of the unfair acts or practices provision of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1);

**WHEREAS**, in the interest of cooperation and to avoid additional costs associated with administrative and judicial proceedings with respect to the above matter, the Bank, through its duly elected and acting Board of Directors ("Board"), has agreed to execute this Stipulation and Consent to the Issuance of a Civil Money Penalty ("Stipulation"), that is accepted by the Comptroller, through his duly authorized representative;

**NOW, THEREFORE**, in consideration of the above premises, it is stipulated by the Bank that:

1

## ARTICLE I

## <u>JURISDICTION</u>

(1)　　The Bank is a national banking association chartered and examined by the Comptroller pursuant to the National Bank Act of 1864, as amended, 12 U.S.C. § 1 *et seq*.

(2)　　The Comptroller is "the appropriate Federal banking agency" regarding the Bank pursuant to 12 U.S.C. §§ 1813(q) and 1818(i).

(3)　　The Bank is an "insured depository institution" within the meaning of 12 U.S.C. § 1818(i).

## ARTICLE II

## <u>CONSENT</u>

(1)　　The Bank, without admitting or denying any wrongdoing, consents and agrees to issuance of the accompanying Consent Order for a Civil Money Penalty ("Order") by the Comptroller.

(2)　　The terms and provisions of the Order apply to the Bank and all of its subsidiaries, even though those subsidiaries are not named as parties to the Order.

(3)　　The Bank consents and agrees that the Order shall be deemed an "order issued with the consent of the depository institution" pursuant to 12 U.S.C. § 1818(h)(2), and consents and agrees that the Order shall become effective upon its execution by the Comptroller through his authorized representative, and shall be fully enforceable by the Comptroller pursuant to 12 U.S.C. § 1818(i).

(4)　　Notwithstanding the absence of mutuality of obligation, or of consideration, or of a contract, the Comptroller may enforce any of the commitments or obligations herein undertaken by the Bank under his supervisory powers, including 12 U.S.C. § 1818(i), and not as

a matter of contract law. The Bank expressly acknowledges that neither the Bank nor the Comptroller has any intention to enter into a contract.

(5)    The Bank declares that no separate promise or inducement of any kind has been made by the Comptroller, or by his agents or employees, to cause or induce the Bank to consent to the issuance of the Order and/or execute this Stipulation.

(6)    The Bank expressly acknowledges that no officer or employee of the Comptroller has statutory or other authority to bind the United States, the United States Treasury Department, the Comptroller, or any other federal bank regulatory agency or entity, or any officer or employee of any of those entities to a contract affecting the Comptroller's exercise of his supervisory responsibilities.

(7)    The Order constitutes a settlement of the civil money penalty proceeding against the Bank contemplated by the Comptroller, based on the practices and violations of law described in the Comptroller's Findings set forth in Article I of the Order. The Comptroller releases and discharges the Bank from all potential liability for a civil money penalty that has been or might have been asserted by the Comptroller based on the practices and violations described in Article I of the Order, to the extent known to the Comptroller as of the effective date of the Order. Notwithstanding this release, the OCC expects the Bank to expeditiously undertake all necessary and appropriate actions to achieve compliance with the Consent Order issued by the OCC pursuant to 12 U.S.C. § 1818(b) (OCC Order AA-EC-2018-15), and to avoid future violations of law and harm to consumers. The OCC expressly reserves its right to assess future civil money penalties, or take other supervisory and/or enforcement actions, including in circumstances where the OCC determines that the Bank is not making sufficient and sustainable

progress towards implementation of an effective and sustainable enterprise-wide compliance risk management program. Such actions could include issuing a cease and desist order pursuant to 12 U.S.C. § 1818(b)(6) that imposes business restrictions and/or requires the Bank to make changes to its senior executive officers or any and/or all members of the Board. Moreover, nothing in this Stipulation or the Order shall prevent the Comptroller from:

(a)    Instituting enforcement actions, other than a civil money penalty, against the Bank based on the findings set forth in Article I of the Order;

(b)    Instituting enforcement actions against the Bank based on any other findings;

(c)    Instituting enforcement actions against the Bank's institution-affiliated parties based on the findings set forth in Article I of the Order, or any other findings; or

(d)    Utilizing the findings set forth in Article I of the Order in future enforcement actions against the Bank or its institution-affiliated parties to establish a pattern or the continuation of a pattern.

Further, nothing in this Stipulation or the Order shall affect any right of the Comptroller to determine and ensure compliance with the terms and provisions of this Stipulation or the Order.

# ARTICLE III

# <u>WAIVERS</u>

(1)    The Bank, by executing this Stipulation and consenting to the Order, waives:

(a)    Any and all rights to the issuance of a Notice of Charges pursuant to 12 U.S.C. § 1818(i);

(b)    Any and all procedural rights available in connection with the issuance of the Order;

(c)    Any and all rights to a hearing and a final agency decision pursuant to 12 U.S.C. § 1818(i), 12 C.F.R. Part 19;

(d)    Any and all rights to seek any type of administrative or judicial review of the Order;

(e)    Any and all claims for fees, costs or expenses against the Comptroller, or any of his agents or employees, related in any way to this enforcement matter or the Order, whether arising under common law or under the terms of any statute, including, but not limited to, the Equal Access to Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412;

(f)    Any and all rights to assert this proceeding, this Stipulation, consent to the issuance of the Order, and/or the issuance of the Order, as the basis for a claim of double jeopardy in any pending or future proceeding brought by the United States Department of Justice or any other governmental entity; and

(g)    Any and all rights to challenge or contest the validity of the Order.

**ARTICLE IV**

**<u>CLOSING</u>**

(1)     The provisions of this Stipulation and the Order shall not inhibit, estop, bar, or otherwise prevent the Comptroller from taking any other action affecting the Bank if, at any time, he deems it appropriate to do so to fulfill the responsibilities placed upon him by the several laws of the United States of America.

(2)     Nothing in this Stipulation or the Order shall preclude any proceedings brought by the Comptroller to enforce the terms of the Order, and nothing in this Stipulation or the Order constitutes, nor shall the Bank contend that it constitutes, a release, discharge, compromise, settlement, dismissal, or resolution of any actions, or in any way affects any actions that may be or have been brought by any other representative of the United States or an agency thereof, including, without limitation, the United States Department of Justice.

(3)     The terms of this Stipulation, including this paragraph, and of the Order are not subject to amendment or modification by any extraneous expression, prior agreements or prior arrangements between the parties, whether oral or written.

**IN TESTIMONY WHEREOF**, the undersigned, as the duly elected and acting Board of Directors of Wells Fargo Bank, N.A., Sioux Falls, South Dakota, have hereunto set their hands on behalf of the Bank.


_/s/Timothy J. Sloan_____     __April 20, 2018_
Timothy J. Sloan                                 Date


_/s/Theodore F. Craver, Jr._____   __April 20, 2018_
Theodore F. Craver, Jr.                          Date


_/s/Karen B. Peetz_____    __April 20, 2018_
Karen B. Peetz                                   Date


_/s/Maria R. Morris_____    __April 20, 2018_
Maria R. Morris                                  Date


_/s/James H. Quigley_____    __April 20, 2018_
James H. Quigley                                 Date

Accepted by:

THE COMPTROLLER OF THE CURRENCY

By: __/s/Greg J. Coleman_____                __April 20, 2018__
      Greg J. Coleman                                                                 Date
      Deputy Comptroller
      Large Bank Supervision